Sean G. Wieber (admitted *pro hac vice*)
SWieber@winston.com
Elizabeth S. Deshaies (admitted *pro hac vice*)
LDeshaies@winston.com
Patrick G. Simonaitis (admitted *pro hac vice*)
PSimonaitis@winston.com
**WINSTON & STRAWN LLP**
300 N. LaSalle Dr., Suite 4400
Chicago, IL 60654-3406
Telephone: (312) 558-5600
Fax: (312) 558-5700

Kevin P. Simpson (SBN: 344644)
KPSimpson@winston.com
**WINSTON & STRAWN LLP**
333 S. Grand Ave., 38th Fl.
Los Angeles, CA 90071
Telephone: (213) 615-1700
Fax: (213) 615-1750

Dana Cook-Milligan (SBN: 301340)
DLCook@winston.com
**WINSTON & STRAWN LLP**
101 California St., 21st Fl.
San Francisco, CA 94111
Telephone: (415) 591-1000
Fax: (415) 591-1400

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

SKYFORGE DIGITAL AG, a Switzerland corporation, and TEKNOLOGY SA, a Switzerland corporation,

Plaintiffs,

vs.

INFOBLOX INC., a Delaware corporation, and RENÉE BURTON, in her individual capacity,

Defendants.

**Case No. 5:25cv9502-PCP-SVK**

**Assigned to Hon. P. Casey Pitts**
**Magistrate Judge Susan van Keulen**
**Courtroom 8**

**PLAINTIFFS' RESPONSE TO [1] DEFENDANTS' MOTION TO DISMISS COMPLAINT PURSUANT TO FED. R. CIV. P. 12(B)(2) AND 12(B)(6), AND [2] SPECIAL MOTION TO STRIKE PURSUANT TO ANTI-SLAPP STATUTE, CAL. CODE OF CIV. PROC. § 425.16**

Hearing Date: March 26, 2026
Time: 10:00 a.m.
Place: Courtroom

Action Filed: November 4, 2025
Trial Date: None Set

# TABLE OF CONTENTS

Page(s)

I. INTRODUCTION ..... 1

II. FACTUAL BACKGROUND ..... 2

A. The Plaintiffs ..... 2

B. The Defendants ..... 2

C. Defendants Create and Define the Term VexTrio to Include Plaintiffs ..... 3

D. Infoblox's Campaign Against Sky/Tek ..... 3

III. ARGUMENT ..... 4

A. Defendants' anti-SLAPP motion is meritless. ..... 4

1. The Anti-SLAPP statute does not apply. ..... 4

2. Sky/Tek is likely to succeed on the merits ..... 7

B. The Complaint states a defamation claim. ..... 7

1. Defendants' statements are "of and concerning" Plaintiffs. ..... 8

2. Defendants' statements are false, factual statements. ..... 10

3. All of Defendants' statements convey a defamatory meaning. ..... 14

C. The Complaint states a false light claim. ..... 16

D. The Complaint states an interference with contract claim. ..... 18

E. The Complaint states a Lanham Act claim. ..... 19

F. The Complaint states a civil conspiracy claim. ..... 21

G. The Court has personal jurisdiction over Defendant Burton. ..... 21

IV. CONCLUSION ..... 25

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*AccuImage Diagnostics Corp. v. Terarecon, Inc.*,
260 F. Supp. 2d 941 (N.D. Cal. 2003) .......... 20

*Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*,
7 Cal. 4th 503 (1994) .......... 21

*Austin v. Univ. of Or.*,
925 F.3d 1133 (9th Cir. 2019) .......... 4, 7, 9, 16, 25

*Automated Pet Care Prods., LLC v. PurLife Brands, Inc.*,
703 F. Supp. 3d 1022 (N.D. Cal. 2023) .......... 19

*Barnes-Hind, Inc. v. Super. Ct.*,
181 Cal. App. 3d 377 (1986) .......... 15

*BBK Tobacco & Foods, LLP v. Aims Grp. USA Corp.*,
723 F. Supp. 3d 973 (D. Nev. 2024) .......... 20

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 4, 7, 25

*Bently Rsrv. LP v. Papaliolios*,
218 Cal. App. 4th 418 (2013) .......... 14

*Blatty v. N.Y. Times Co.*,
42 Cal. 3d 1033 (1986) .......... 9

*Brentwood Commc'ns Int'l Inc. v. Fully Torqued Prods. LLC*,
2025 Cal. Super. LEXIS 46239 (Cal. Super. Ct. Aug. 1, 2025) .......... 17

*Buchanan v. Soto*,
241 Cal. App. 4th 1353 (2015) .......... 22

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985) .......... 24

*Calder v. Jones*,
465 U.S. 783 (1984) .......... 23

*Children's Health Def. v. Facebook Inc.*,
546 F. Supp. 3d 909 (N.D. Cal. 2021) .......... 20

*Church of Scientology of Cal. v. Flynn*,
744 F.2d 694 (9th Cir. 1984) .......... 9

*CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066 (9th Cir. 2011) .......... 22

*Corman v. Blanchard*, 211 Cal. App. 2d 126 (1962) .......... 15

*Davis v. Cranfield Aero. Sols., Ltd.*, 71 F.4th 1154 (9th Cir. 2023) .......... 23

*Davis v. Metro Prods., Inc.*, 885 F.2d 515 (9th Cir. 1989) .......... 23

*Dickinson v. Cosby*, 37 Cal. App. 5th 1138 (2019) .......... 8, 9, 14

*Gillespie v. Prestige Royal Liquors Corp.*, 183 F. Supp. 3d 996 (N.D. Cal. 2016) .......... 25

*Glob. Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101 (9th Cir. 2020) .......... 22

*H&M Assocs. v. City of El Centro*, 109 Cal. App. 3d 399 (1980) .......... 17

*Ion Equip. Corp. v. Nelson*, 110 Cal. App. 3d 868 (1980) .......... 17

*Kahn v. Bower*, 232 Cal. App. 3d 1599 (1991) .......... 14

*L.A. Mem'l Coliseum Comm'n v. Insomniac, Inc.*, 233 Cal. App. 4th 803 (2015) .......... 21

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) .......... 20

*Mahoney v. Meta Platforms, Inc.*, 710 F. Supp. 3d 771 (N.D. Cal. 2024) .......... 7

*Matthews v. Apple, Inc.*, No. 4:24-cv-00272-JST (N.D. Cal. Jan. 16, 2024) .......... 21

*Megarry v. Norton*, 137 Cal. App. 2d 581 (1955) .......... 14

*Mulato v. Wells Fargo*, 76 F. Supp. 3d 929 (N.D. Cal. 2014) .......... 23

*Neurelis, Inc. v. Aquestive Therapeutics, Inc.*, 71 Cal. App. 5th 769 (2021) .......... 5

*Nicosia v. De Rooy*,
72 F. Supp. 2d 1093 (N.D. Cal. 1999) ........ 14, 23

*Palm Springs Tennis Club v. Rangel*,
73 Cal. App. 4th 1 (1999) ........ 9

*Pegasystems, Inc. v. Appian Corp.*,
463 F. Supp. 3d 152 (D. Mass. 2020) ........ 20

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. of Med. Progress*,
890 F.3d 828 (9th Cir. 2018) ........ 4, 7

*Resolute Forest Prods., Inc. v. Greenpeace Int'l*,
2023 WL 3568077 (N.D. Cal. Apr. 21, 2023) ........ 13, 15, 16

*SCC Acquisitions, Inc. v. Super. Ct.*,
243 Cal. App. 4th 741 (2015) ........ 17

*Selleck v. Globe Int'l, Inc.*,
166 Cal. App. 3d 1123 (1985) ........ 14, 15

*Simpson Strong-Tie Co., Inc. v. Gore*,
49 Cal. 4th 12 (2010) ........ 5

*Southland Sod Farms v. Stover Seed Co.*,
108 F.3d 1134 (9th Cir. 1997) ........ 19

*People ex rel. Strathmann v. Acacia Rsch. Corp.*,
210 Cal. App. 4th 487 (2012) ........ 4

*Sussman v. Playa Grande Resort, S.A. DE C.V.*,
839 F. App'x 166 (9th Cir. 2021) ........ 23

*Swenberg v. dmarcian, Inc.*,
68 Cal. App. 5th 280 (2021) ........ 23

*UMG Recording, Inc. v. Glob. Eagle Ent., Inc.*,
117 F. Supp. 3d 1092 (C.D. Cal. 2015) ........ 18

*Unite Eurotherapy, Inc. v. Walgreen Co.*,
2017 WL 513008 (S.D. Cal. Feb. 7, 2017) ........ 19

*Weinberg v. Feisel*,
110 Cal. App. 4th 1122 (2003) ........ 6

*Xu v. Huang*,
73 Cal. App. 5th 802 (2021) ........ 4, 5, 6, 7

**Statutes**

Cal. Civ. Code § 45a ........ 15

Cal. Code Civ. Proc. § 425.16(a) ........ 4

Cal. Code Civ. Proc. § 425.16(b)(1) ........ 4

Cal. Code Civ. Proc. § 425.17(c) ........ 4

Cal. Code Civ. Proc. § 425.17(c)(2) ........ 7

**Other Authorities**

15 Business Organizations with Tax Planning § 211.02(2)(a) (2026) ........ 9

## I. INTRODUCTION

This case is about Defendants' reckless marketing strategy that prioritized profits over facts and, as a result, destroyed Plaintiffs' lawful businesses. Defendants Infoblox and its Vice President of Threat Intelligence Renée Burton ("Burton") published at least 35 false and defamatory statements accusing Plaintiffs Skyforge and Teknology (together, "Sky/Tek") of criminal misconduct, fraud, and other wrongdoing. For more than a year, Defendants have pitched Infoblox's IT security services to prospective customers by claiming that Plaintiffs are part of a Russian cybercriminal conspiracy that Infoblox's services can protect against. By repeating these claims in a series of marketing blog posts, business-development industry presentations, webinars, podcasts, and elsewhere, Defendants have permanently damaged Plaintiffs' reputations and impaired their ability to conduct business in the U.S. and around the world.

Defendants' statements are unequivocally false, as meticulously explained in the Complaint. Before filing this lawsuit, Plaintiffs provided voluminous information debunking Defendants' statements and urged Defendants to withdraw them. But Defendants never backed up their defamatory statements or changed course. Instead, Defendants threatened Plaintiffs, warning that if Plaintiffs filed this lawsuit, Defendants would file an anti-SLAPP motion based on "extensive information and evidence" that Defendants "stood ready" to submit.

But now, Defendants' supposed "information and evidence" is nowhere to be seen. They did not provide it with their anti-SLAPP motion as promised, and Defendants' motions do not even contend that any of their published statements are true. Nor do Defendants deny the defamatory meaning of most of the statements. Moreover, Defendants do not deny that they made the statements to encourage potential customers to buy their products.

Instead, Defendants selectively parse their defamatory statements to try to shield themselves behind California's anti-SLAPP statute. But that protection is not available here. Defendants' publications fall squarely within the express commercial speech exemption to the anti-SLAPP law, and the detailed allegations in Plaintiffs' 40-page complaint are more than sufficient to state their claims. Nothing more is required at this phase. For these reasons, the Court should deny Defendants' motions so that Plaintiffs can pursue damages for Defendants' willful destruction of their businesses.

## II. FACTUAL BACKGROUND

### A. The Plaintiffs

Plaintiff Skyforge Digital AG ("Skyforge") is a legitimately organized and operated Switzerland-based advertising technology company. Compl. ¶¶ 14, 22. Skyforge develops and sells affiliate marketing services, which are provided by two key platforms, Los Pollos and Tacolo.co. *Id.* ¶¶ 24–27.

Plaintiff Teknology SA ("Teknology") provides servers and technical services for various companies, including Skyforge. Compl. ¶ 32. Teknology, which shares common ownership with Skyforge, provides Skyforge with servers to operate its affiliate marketing network. *Id.*

Both Skyforge and Teknology (collectively, "Sky/Tek") are legally organized corporations: each has a board of directors, executives, and other C-suite management-level employees, and each answers to its shareholders. *Id.* ¶ 35. Neither Skyforge nor Teknology, nor any affiliated entity, nor any of the founders or executives of these companies, have ever been indicted for or convicted of any crime anywhere in the world. *Id.* ¶ 36. Sky/Tek employ robust processes to prevent their services from being abused, and each fully complies with the laws and regulations where they operate. *Id.* ¶ 38. To be clear, and contrary to Defendants' claims, Sky/Tek have no affiliation and no relationship with Russian (or any other) cybercriminal organizations. *Id.* ¶ 111. They are not "controlled" by a cybercriminal conspiracy, *id.* ¶ 109, and their executives do not "steal[] money by conning people [and] as a result, … live a lavish lifestyle that most people only dream of." *Id.* ¶ 95(xi).

### B. The Defendants

Defendant Infoblox is a for-profit cybersecurity company that markets and sells various information technology products and services to businesses. *Id.* ¶ 42. As part of Infoblox's marketing and sales strategy, Infoblox publishes blog posts and has its executives and sales team give presentations at industry conferences and on podcasts that purport to identify IT security risks while simultaneously marketing Infoblox products aimed at eliminating or reducing those risks. *See id.* ¶¶ 43–54. Defendant Burton is an Infoblox executive who works in online "threat detection," and Burton actively participates in this strategy by promoting Infoblox products and her own threat detection skills in public appearances and by publishing blog posts memorializing her theories related to online threat actors and criminals that need to be protected against. *See id.* ¶¶ 55–57. These public appearances and publications are part of

Infoblox's strategy to "evangelize" about the value of its products and drive sales, as reflected in publicly available marketing job listings for the company. *Id*. ¶ 48.

### C. Defendants Create and Define the Term VexTrio to Include Plaintiffs

Part of Defendants' marketing strategy is to create "catchy" names for so-called cyber threat actors. In November 2022, Defendants created the term "VexTrio Viper" to describe "[t]he longest running traffic distribution system (TDS) known in the industry with the largest number of criminal affiliates, brokering traffic for others while delivering malicious campaigns of their own." *Id*. ¶¶ 55–56. According to Defendants, VexTrio is a "Russian-nexus cybercriminal organization with close ties to some of the most prolific website hackers in the world," and "VexTrio steals money by conning people." *Id*. ¶ 59. In their publications, Defendants recklessly and without any basis lumped Sky/Tek in with other industry entities, falsely accusing Sky/Tek of being part of this alleged criminal conspiracy.

Since then, Defendants have repeatedly accused Skyforge's platforms (namely Los Pollos and Tacolo.co) of being part of "VexTrio." For example, Defendants wrote that "Los Pollos" is "just one entity in a sprawling criminal enterprise that makes up VexTrio," and that "VexTrio" is "the controller of both firms, [Los Pollos and Tacolo.co]." *See* Compl. Ex. 2, at 3, 6.

### D. Infoblox's Campaign Against Sky/Tek

After misidentifying Sky/Tek as core co-conspirators in the "Russian-nexus cybercriminal organization" dubbed VexTrio, Defendants began a multifaceted, deliberate, and sustained campaign against these companies. They published a series of blog posts, social media statements, and conference presentations falsely accusing Sky/Tek and their executives of operating as part of the vast, Russian-linked criminal enterprise. *Id.* ¶¶ 87, 91, 95, 98, 100, 118. These publications were part of a coordinated effort to paint Sky/Tek as criminal actors, often relying on innuendo, misleading imagery, and outright fabrications. Defendants went so far as to contact Sky/Tek's business partners, service providers, and banks, urging them to sever ties with Sky/Tek based on these false allegations. *Id.* ¶¶ 125–128. This campaign's clear objective was to drive commercial interest in Infoblox's own cybersecurity products at Sky/Tek's expense, by positioning Infoblox's products as a solution to the threats Defendants falsely attributed to Sky/Tek. *Id.* ¶¶ 88, 96, 101. As a result, Sky/Tek lost contracts, its banking relationships were terminated, and revenue and user engagement plummeted. *Id*. ¶¶ 124–128, 163, 168.

## III. ARGUMENT

Plaintiffs' complaint does all that is necessary at this early stage: it "provide[s] 'enough facts to state a claim to relief that is plausible on its face.'" *Austin v. Univ. of Or.*, 925 F.3d 1133, 1137 (9th Cir. 2019) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To test whether this standard is satisfied, "[a]ll factual allegations are accepted as true, and all reasonable inferences must be drawn in favor of the plaintiff[s]." *Id.* Defendants' anti-SLAPP motion invokes no higher standard because it raises no factual issues. *Planned Parenthood Fed'n of Am., Inc. v. Ctr. of Med. Progress*, 890 F.3d 828, 834 (9th Cir. 2018). Applying this standard, Plaintiffs have stated each of their claims and established personal jurisdiction. Therefore, even if the California anti-SLAPP law applied (it does not), the Court should reject Defendants' motion to strike and deny their motion to dismiss.

### A. Defendants' anti-SLAPP motion is meritless.

Defendants' anti-SLAPP motion to strike fails for at least two independent reasons. First, the California anti-SLAPP statute does not apply because Plaintiffs' claims arise from commercial speech, not "protected speech." Cal. Code Civ. Proc. § 425.16(a); *Xu v. Huang*, 73 Cal. App. 5th 802, 813 (2021) (commercial speech is "entirely exempt" from anti-SLAPP protection).

Second, even if Defendants could satisfy this threshold "protected speech" prong, their anti-SLAPP motion fails because the facts pled by Plaintiffs are more than sufficient to succeed on the merits of their claims. *See* Cal. Code Civ. Proc. § 425.16(b)(1).

#### 1. The anti-SLAPP statute does not apply.

The challenged statements are commercial speech, and thus the California anti-SLAPP statute does not apply. Cal. Code Civ. Proc. § 425.17(c). Whether a lawsuit falls within a section 425.17 exemption is "'a threshold issue'" to be addressed "'prior to examining the applicability of § 425.16.'" *Xu*, 73 Cal. App. 5th at 813 (citing *People ex rel. Strathmann v. Acacia Rsch. Corp.*, 210 Cal. App. 4th 487, 498 (2012)). Defendants wholly ignore this threshold issue, but it is dispositive: because the commercial speech exemption applies, Defendants' "special motion to strike should [be] denied." *Id.*

The commercial speech exemption applies if four elements are satisfied: (1) "the cause of action is against a person primarily engaged in the business of selling … goods or services;" (2) "the cause of action arises from a statement or conduct by that person consisting of representations of fact about that

person's … business operations, goods, or services;" (3) "the statement or conduct was made either for the purpose of … promoting, or securing sales of … the person's goods or services or in the course of delivering the person's goods or services;" and (4) "the intended audience for the statement or conduct" is "an actual or potential buyer or customer, or a person likely to repeat the statement to, or otherwise influence, an actual buyer or customer." *Neurelis, Inc. v. Aquestive Therapeutics, Inc.*, 71 Cal. App. 5th 769, 785–86 (2021) (citing *Simpson Strong-Tie Co., Inc. v. Gore*, 49 Cal. 4th 12, 30 (2010)); *see also Xu*, 73 Cal. App. 5th at 814. When weighing these four elements, the Court must construe all facts in favor of the plaintiff. *See id.* at 815. All four elements are satisfied here.

***First***, Infoblox is an information technology company primarily engaged in selling cybersecurity products. Compl. ¶ 42. At all times relevant to this lawsuit, Burton acted as the Vice President of Threat Detection at Infoblox, and her role was directly tied to selling Infoblox's products. *Id.* ¶¶ 17, 51.

***Second***, Defendants touted the ability of their products to uncover and stop the alleged cybercrime conspiracy addressed in their defamatory publications. *See id.* ¶¶ 88, 96, 101. For example, during an industry conference presentation, Burton and other Infoblox employees identified Sky/Tek's executives as criminals, then encouraged conference attendees to "read [Infoblox's] research," read forthcoming blog posts about Sky/Tek and other alleged criminal entities, and visit Infoblox's website where it sells its products. *Id.* ¶ 93. Similarly, during podcast appearances Burton and others credited Infoblox's products with helping them (mis)identify Sky/Tek and its affiliates as part of VexTrio. *Id.* ¶¶ 98(i), 118(iii). That Defendants' statements do not implicate a competing product is irrelevant; "the commercial speech exemption is not limited to cases involving comparative advertising claims[.]" *See Xu*, 73 Cal. App. 5th at 816 (internal quotation marks omitted)). "It is enough that the statements relate to [Infoblox's] own product." *Neurelis*, 71 Cal. App. 5th at 786–87.

***Third***, the defamatory statements were made to support Infoblox's "evangelist" marketing strategy and thus were made "for the purpose of … promoting, or securing sales … of [Infoblox's] goods or services." *See* Compl. ¶¶ 42–57. Infoblox acknowledges that it publishes blog posts that identify IT security risks to market Infoblox's products. *Id.* ¶ 43. Infoblox publicly admits that the blog and other content creation are part of its marketing strategy. *Id.* ¶¶ 43–44, 46–50. Burton was hired to lead this

marketing strategy. *Id.* ¶ 55. And she recognizes that her group at Infoblox was responsible for "*produc[ing] the content for [Infoblox's] security products.*" *Id.* ¶ 52 (emphasis in original).

***Fourth***, the statements were directed to Infoblox's potential or actual customers. *See id.* ¶¶ 43–44, 46–50. Infoblox boasts that some customers report that the blog convinced them to purchase Infoblox's products. *Id.* ¶ 47. Infoblox also participates in conferences to market its products. Infoblox made eight defamatory statements about Sky/Tek during its August 6, 2025 presentation at Black Hat, one of the largest cyber security conferences in the country. *Id.* ¶ 89. At the end of the presentation, Infoblox instructed conference attendees to read its "research"—the defamatory blog posts—and directed attendees to Infoblox's website, where they could purchase Infoblox products. *Id.* ¶ 93.

Moreover, even if not all elements were met, Defendants still fall outside the protection of the anti-SLAPP statute. That is because "the commercial nature of the speech remains a relevant 'contextual cue' in determining whether it merits protection" under section 425.16. *Xu*, 73 Cal. App. 5th at 814. "[T]he identity of the speaker, the intended audience, and the purpose of the [speech] inform th[is] analysis." *Id.* (internal quotations and citation omitted). And "[t]he context in which statements are made holds significant sway in terms of whether they are considered to be in furtherance of free speech in connection with a public issue …." *Id.* at 807. Here, the challenged statements were published by a for-profit company (Infoblox) and one of its executives involved in the company's marketing strategy (Burton). Compl. ¶¶ 4, 9, 49–57. The statements were published to Infoblox's customers and potential customers. *See id.* ¶¶ 42–57; *see also id.* ¶¶ 89–90. And the statements were published for the purpose of marketing Infoblox's products. *Id.* ¶¶ 42–57, 88, 89–90, 93, 96, 101. Context reveals that each statement was made to tout the ability of Infoblox's products, and not to contribute to any debate on public issues. *See id.* And so Defendants are not entitled to the anti-SLAPP statute's protections.

On reply, Defendants may argue that the commercial speech exemption does not apply because their statements concern an issue of public interest. That is a false premise: there is no issue of "public interest" here, and Defendants cannot manufacture one by falsely calling Sky/Tek criminals as part of a marketing scheme. *See Weinberg v. Feisel*, 110 Cal. App. 4th 1122, 1135 (2003) ("The fact that defendant's statements accuse plaintiff of criminal conduct make them defamatory on their face. It does not automatically make them a matter of public interest."). Here, as in *Weinberg*, "there are no charges

pending against plaintiff," "defendant has not taken action intended to result in a criminal investigation or prosecution," "[d]efendant did not report his suspicions to law enforcement," "there is no evidence that he intended to pursue civil charges against plaintiff," and "the record does not support a conclusion that plaintiff is a public figure or that he has thrust himself into any public issue." *Id.* Instead, "defendant began a private campaign, so to speak, to discredit plaintiff in the eyes of a relatively small group of fellow [industry players]." *Id.* Moreover, even if this were a matter of "public interest," the law is clear that commercial speech is exempt from anti-SLAPP protection "notwithstanding that the conduct or statement concerns an important public issue." Cal. Code Civ. Proc. § 425.17(c)(2); *see Xu*, 73 Cal. App. 5th at 811–17 (applying commercial speech exemption to statements accusing the plaintiff of fraudulent and unethical conduct purportedly impacting the plaintiff's clients).

Thus, because Defendants' statements are commercial speech, the anti-SLAPP statute does not apply, and their motion should be denied on that basis alone.

**2. Sky/Tek is likely to succeed on the merits.**

Defendants' anti-SLAPP motion fails under prong two, as well, because Sky/Tek are likely to succeed on the merits. Because Defendants' motion raises no factual issues, the second prong of the anti-SLAPP analysis is governed by the same standard as a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *See Planned Parenthood*, 890 F.3d at 834. Under this standard, all factual assertions are accepted as true, all reasonable inferences drawn in favor of Plaintiffs, and the Complaint need only "provide 'enough facts to state a claim to relief that is plausible on its face.'" *Austin*, 925 F.3d at 1137 (quoting *Twombly*, 550 U.S. at 570). Plaintiffs' allegations meet this standard, and so Defendants' motions to strike and dismiss both fail.[1]

**B. The Complaint states a defamation claim.**

Plaintiffs allege facts sufficient to establish every element of their defamation claim: each challenged statement addresses Plaintiffs, each is false, each conveys a defamatory meaning, and each caused harm. *See Dickinson v. Cosby*, 37 Cal. App. 5th 1138, 1155 (2019).

[1] If the motion to dismiss is granted, in full or in part, the Court should defer any consideration of the anti-SLAPP motion because leave to amend would be appropriate. *See Mahoney v. Meta Platforms, Inc.*, 710 F. Supp. 3d 771, 781 (N.D. Cal. 2024) ("If the court finds deficiencies in the claims as pleaded, it may defer consideration of the anti-SLAPP motion pending the filing of an amended complaint.").

**1. Defendants' statements are "of and concerning" Plaintiffs.**

Defendants concede that several of their statements are "of and concerning" Plaintiffs because the statements directly name Plaintiffs. *See* Mot. at 14; *see* Compl. ¶¶ 91(iii) (identifying Tacolo.co, Adtrafico, AdsPro Group/AdsPro, HolaCode, Fidelity Mail, and Teknology as part of VexTrio), 95(ii) (listing Plaintiffs and several of their founders/owners as part of VexTrio), 95(vi) (naming Plaintiff Teknology as part of a VexTrio scam). Those allegations alone are grounds to deny Plaintiffs' motions.

The remaining allegations address Plaintiffs as well. Defendants expressly, albeit incorrectly, identified Plaintiffs as part of the fictitious VexTrio. For example, Defendants' own August 6, 2025 article, "VexTrio's Origin Story," was dedicated to identifying the individuals and entities that allegedly comprised VexTrio, and it identified Sky/Tek. *See* Compl. Ex. 4, at 9–19 ("The People"), 19–28 ("The Enterprise"). Defendants proceeded to implicate Plaintiffs in all of VexTrio's alleged wrongdoing. Compl. ¶ 5; *id.* ¶¶ 5, 58–59, 85, 87, 91, 94–95, 97–98, 99–100, 103–106, 109–110, 118. Thus, Defendants themselves told readers that their statements about VexTrio were about Sky/Tek. *See* Compl. ¶ 103. They cannot now disregard their own statements and hide from liability by claiming that readers did not know that statements about VexTrio were statements about Sky/Tek. That is illogical.

Nor can Defendants escape liability because their statements reference Sky/Tek platforms and representatives, and not the companies themselves. So long as at least one other person understood the statement to be about Sky/Tek, this element is satisfied. *See Dickinson*, 37 Cal. App. 5th at 1162. Hetzner, Credit Suisse, UBS, and Cornèr Banca SA all canceled their contracts with Skyforge in late 2024 because of defamatory statements. Compl. ¶¶ 153–154. Thus, they must have recognized that the defamatory statements were about Plaintiffs. *See Dickinson*, 37 Cal. App. 5th at 1162 (noting that evidence that a third party understood the statements to be of and concerning the plaintiff can be indirect).

Defendants' narrow focus on whether each statement, standing alone, names Skyforge or Teknology is misguided. The "of and concerning" requirement is assessed based on the "totality of the circumstances," which requires consideration of the "nature and full content of the communication and ... the knowledge and understanding of the audience to whom the publication was directed." *Id.* at 1160 (internal citations omitted). When read in this context, each statement referencing VexTrio or accusing Sky/Tek's platforms or representatives of misconduct is understood to be a statement accusing Sky/Tek

of misconduct, because "the effect of the statement is to discredit the corporation in its business dealings." *See* 15 Business Organizations with Tax Planning § 211.02(2)(a) (2026); *see Palm Springs Tennis Club v. Rangel*, 73 Cal. App. 4th 1, 6 (1999) (recognizing that a corporation can sustain a defamation claim when defamatory statements about a corporate officer are related to the corporation's trade or business).

Defendants' statements about Sky/Tek's co-founders and officers directly implicate Sky/Tek's business operations by tying the companies and their founders to a criminal conspiracy. For example, accusing Sky/Tek's representatives of being "embroiled in a Russian-nexus cybercriminal organization with close ties to some of the most prolific website hackers in the world" implies to the reader that the companies operated by and represented by these individuals are engaged in criminal misconduct. *See* Compl. ¶ 95(i) and Ex. 4 at 3; *see also Church of Scientology of Cal. v. Flynn*, 744 F.2d 694, 697 (9th Cir. 1984) ("Under California law, there is no requirement that the [entity] defamed be mentioned by name. It is sufficient if from the evidence the jury can infer that the defamatory statement applies to the plaintiff." (cleaned up)). And by implying that a Sky/Tek founder's lifestyle is funded by proceeds from crime, Defendants tell readers that Sky/Tek must be involved in crime. Compl. ¶ 95(iii) and Ex. 4 at 17.

The same is true of the statements about Sky/Tek's platforms. By stating that VexTrio operates Skyforge's platforms Los Pollos and Tacolo.co, Defendants imply that Skyforge itself is run by VexTrio's criminal enterprise. *See* Compl. ¶¶ 87(ii), 87(iii), 91(iii) and Ex. 2 at 6, 16.

Defendants improperly try to use their "guilt by association" theory as both a sword and a shield. On one hand, Defendants' publications named Plaintiffs as part of VexTrio and falsely implicated Plaintiffs in their claims about VexTrio. But now, when called to account for their lies, Defendants attempt to use their "group accusation" theory to defeat the "of and concerning" element of Plaintiffs' defamation claim. However, this is not a case where "the group [defamed] is ... so large, or its boundaries so amorphous, that its members could not be readily ascertained." *See Dickinson*, 37 Cal. App. 5th at 1162; *see, e.g.*, *Blatty v. N.Y. Times Co*., 42 Cal. 3d 1033, 1044 (1986) ("Statements about a religious, ethnic, or political group could invite thousands of lawsuits from disgruntled members of these groups ...."). The exact opposite is true: Defendants themselves identified Sky/Tek as part of the select group they have dubbed VexTrio, making that group's membership "readily ascertainable." *See* Compl. ¶ 103. Regardless, the Court need not resolve that factual issue at this stage. *See Austin*, 925 F.3d at 1137

(Sky/Tek must "provide enough facts to state a claim to relief that is plausible on its face" (citation and quotation marks omitted)).

**2. Defendants' statements are false, factual statements.**

**i. Plaintiffs alleged facts sufficient to show falsity.**

Rather than assert that anything they published was true, Defendants contend that Plaintiffs' falsity allegations are insufficient. That blatantly ignores the pages of information Sky/Tek provided that demonstrate the challenged statements are false. In the 35 defamatory statements, Defendants make six false claims: (1) that Sky/Tek are affiliated with or owned by "VexTrio"; (2) that Sky/Tek harbor or knowingly provide infrastructure to threat actors; (3) that Sky/Tek trick users into subscribing to malicious push notifications; (4) that Sky/Tek participate in spam distribution; (5) that Sky/Tek's business models are devoted to developing fake or scam applications and websites; and (6) that Sky/Tek engaged in fraud. The Complaint's allegations are sufficient to establish that each of these claims is false.

**Sky/Tek are not affiliated with or owned by VexTrio.**[2] Sky/Tek have concretely and specifically alleged facts that show that Defendants' claims to the contrary are false. *See* Compl. ¶¶ 3 (Sky/Tek are not controlled by a Russian criminal gang and answer to shareholders), 22 (Skyforge operates its internet-based platforms, not "VexTrio"), 23 (same), 26 (same), 35 (Sky/Tek are legally organized, with full corporate structures, and answer to shareholders), 36 (neither Sky/Tek nor entities and individuals affiliated with the companies have been indicted or convicted of a crime), 37 (third parties, not Sky/Tek, sometimes attempt to abuse Sky/Tek's services), 91(iii) (Los Pollos, Tacolo.co, Adtrafico, AdsPro Group/AdsPro, and HolaCode are Sky/Tek platforms, not "VexTrio" companies), 102 (there is no evidence Sky/Tek are part of "VexTrio"), 107–108 (Sky/Tek have no affiliation with other TDSs, illustrating that "VexTrio" operates independently of Sky/Tek), 111 (Sky/Tek have no relationship with Russian criminals or the Russian government). Sky/Tek thus have alleged the truth—that these companies are legitimate and lawful businesses, properly incorporated and structured. *Id.* ¶¶ 14 (pleading Skyforge is lawfully organized), 15 (pleading Teknology is lawfully organized), 35 (pleading Sky/Tek are legally organized, with lawful corporate structures, and answer to shareholders). They are controlled by their executives and answer to their shareholders—not the so-called VexTrio. *Id.* ¶¶ 3, 35. Taken as

[2] *See* Compl. ¶¶ 87(i – iii), 91(iii–iv), 95(i–iv, vi–vii, x), 98(i–ii, v), 100(i–iv), 118(i).

true, as they must be at this stage, these allegations are more than sufficient to show that Defendants' accusations in footnote 2 above that Sky/Tek are affiliated or owed by a criminal network, rather than legally operating businesses, are false.

**Sky/Tek do not harbor or knowingly provide infrastructure to threat actors.**[3] To show this accusation is false, the Complaint affirmatively describes how bad actors try to abuse affiliate-marketing services like those offered by Sky/Tek and the processes in place to combat that abuse. Compl. ¶¶ 37 (third parties, not Sky/Tek, sometimes attempt to abuse Sky/Tek's services), 38 (Sky/Tek employ robust processes to try to prevent their services from being abused, and each complies fully with the laws and regulations where they operate, including "Know Your Customer" checks; anti-money laundering checks; reports from advertisers and financial institutions; consumer, affiliate, and advertiser feedback; and active monitoring for abuse), 105 (Sky/Tek platforms paused services when they discovered third-party abuse). The Complaint explains that, "[w]hen Sky/Tek become aware that either an affiliate or an advertiser has violated the terms of the contractual arrangements between the parties, Sky/Tek have, and exercise, the right to terminate any affiliate or advertiser that violates the terms and to block the offender from continued use of the affiliate network." *Id.* ¶ 41. In their defamatory publications, Defendants suggest that Los Pollos's decision to pause its push link monetization program somehow showed that Los Pollos was knowingly providing infrastructure to threat actors. *Id.* ¶ 104. The opposite is true: "Los Pollos (through Skyforge) paused this functionality in response to its own discovery that certain affiliates had been abusing the service." *Id.* ¶ 105. Sky/Tek's pleadings must be taken as true at this stage of the litigation, and thus, Sky/Tek have adequately pled that the defamatory statements that Sky/Tek harbor or knowingly provide infrastructure to threat actors, as listed in footnote 3 below, are false.

**Sky/Tek do not trick users into subscribing to malicious push notifications.**[4] The Complaint adequately alleges Defendants' malicious push notification accusation is false by explaining that Sky/Tek platforms allow affiliates and advertisers to market to targeted audiences using push notifications, but they require the affiliates and advertisers to comply with their applicable terms of service. *See id.* ¶¶ 23–32 (Sky/Tek platforms provide advertising infrastructure to third parties), 37 (third parties, not Sky/Tek,

[3] *See* Compl. ¶¶ 87(iii), 91(v), 95(vi, x), 98(ii, iv), 100(i, iv), 118(iv).
[4] *See* Compl. ¶¶ 95(viii), 118(i).

sometimes attempt to abuse Sky/Tek's services), 38 (Sky/Tek employ robust processes to try to prevent their services from being abused, and each complies fully with the laws and regulations where they operate, including "Know Your Customer" checks; anti-money laundering checks; reports from advertisers and financial institutions; consumer, affiliate, and advertiser feedback; and active monitoring for abuse), 39–41 (If Sky/Tek become aware of abuse of their services or violation of the terms of the services, Sky/Tek have, and exercise, the right to terminate those services). And when Skyforge discovered that a small number of affiliates were using cloaking techniques to skirt those rules, the company paused the program to allow its technical and business teams to address the issue. *Id.* ¶ 105 (explaining Sky/Tek's platform paused services when it discovered third-party abuse). Taking these allegations as true, Sky/Tek have pled that the defamatory statements in footnote 4 above about push notifications are false.

**Sky/Tek do not participate in spam distribution.**[5] Sky/Tek alleged this accusation was false by detailing the feedback process that "allows any consumer, affiliate, or advertiser" to "request that spam be taken down, and to report any other violation." *Id.* ¶ 38(v); *see also id.*¶¶ 37 (third parties, not Sky/Tek, sometimes attempt to abuse Sky/Tek's services), 38 (Sky/Tek employ robust processes to try to prevent their services from being abused, including "Know Your Customer" checks, anti-money laundering checks, reports from advertisers and financial institutions, consumer, affiliate, and advertiser feedback, and active monitoring for abuse, and each complies fully with the laws and regulations where they operate, including relevant U.S. statutes governing spam). Sky/Tek also alleged that its "technical teams monitor these reporting avenues and work expeditiously to remediate any issues that are conveyed," "includ[ing] complaints related to spam, which Sky/Tek also combat by following industry standards and meeting all legal obligations." *Id.* ¶ 38(v). Taken as true, Sky/Tek sufficiently pled that the defamatory statements in footnote 5 below about spam distribution are false.

**Sky/Tek's business models are legitimate; they are not devoted to developing fake or scam applications and websites.**[6] The Complaint alleges this accusation is false by explaining that Sky/Tek platforms generally do not control the content for landing pages. *Id.* ¶¶ 28–31 (explaining that third

[5] *See* Compl. ¶¶ 95(iv, vi), 100(iv).
[6] *See* Compl. ¶¶ 91(i–ii, vi, vii), 95(v, vi, vii, x), 100(i–iii).

parties, not Sky/Tek, choose the ad copy and content to display on other third-party websites), 37 (third parties, not Sky/Tek, sometimes attempt to abuse Sky/Tek's services). And any applications Sky/Tek do offer fully comply with the laws and regulations where they operate. *Id.* ¶¶ 28–31, 38 (Sky/Tek employ robust processes to try to prevent their services from being abused, and each complies fully with the laws and regulations where they operate, including "Know Your Customer" checks; anti-money laundering checks; reports from advertisers and financial institutions; consumer, affiliate, and advertiser feedback; and active monitoring for abuse). Taking these allegations as true, the defamatory statements listed in footnote 6 above about Sky/Tek's business models are false.

**Sky/Tek have not engaged in and do not permit fraud.**[7] The Complaint alleges this accusation is false by describing the "robust processes" Sky/Tek employ "to try to prevent their services from being abused," and to ensure that they comply with all applicable laws and regulations, including monthly reporting from advertisers on fraudulent activity, monthly reporting related to alerts from financial institutions about chargebacks or fraud, and active monitoring to ensure that "dormant affiliate accounts are not being sold to third parties without Skyforge's knowledge or to identify other potential acts of abuse." Compl. ¶ 38 (iii, iv, vi). Sky/Tek also pled that the companies are lawfully organized and legally operating and that Sky/Tek's founders, executives, and affiliated entities have never been convicted of fraud or any other crime. *Id.* ¶¶ 3 (Sky/Tek are not controlled by a Russian criminal gang and answer to shareholders), 35 (Sky/Tek are legally organized, with full corporate structures, and answer to shareholders), 36 (neither Sky/Tek nor affiliated entities and individuals have been indicted or convicted of a crime), 37 (third parties sometimes attempt to abuse Sky/Tek's services). Taking these allegations as true, Sky/Tek have adequately pled that the defamatory statements listed in footnote 7 below about Sky/Tek and fraud are false.

Thus, Plaintiffs have sufficiently pled falsity as to all defamatory statements in the Complaint.

**ii. Defendants' statements are not opinions.**

Defendants concede that 31 of the 35 challenged statements are factual and thus can be defamatory. *See* Mot. at 19–20. The remaining four are factual statements, too. When read in context, as is required, these statements do not qualify as opinions or hyperbole. *See Resolute Forest Prods., Inc.*

---

[7] *See* Compl. ¶¶ 91(v, vii–viii), 95(i, vii, ix, xi), 98(iii–v), 118(ii–iv).

*v. Greenpeace Int'l*, 2023 WL 3568077, at *3 (N.D. Cal. Apr. 21, 2023) ("In determining whether a publication is libelous or not it must be considered as a whole and must not be divided into segments and each portion treated as a separate unit." (quoting *Megarry v. Norton*, 137 Cal. App. 2d 581, 582 (1955)).

Infoblox is a cybersecurity company and Burton is one of its PhD-accredited executives touted as an industry expert. Compl. ¶¶ 16–17. In conjunction with the defamatory statements, Defendants claimed that Infoblox's technology enabled them to uncover Sky/Tek's alleged crimes. *Id.* ¶¶ 42, 88(i). Defendants also claimed their statements were backed by "thousands of hours" of research. *Id.* ¶ 8. To now claim those statements are hyperbolic is disingenuous. Defendants published the defamatory statements on Infoblox's blog, during conference presentations, and on podcasts, where reasonable audiences would understand the statements to be literal, factual assertions. *See Dickinson*, 37 Cal. App. 5th at 1163 ("The dispositive question is not whether a statement is fact or opinion, but whether a reasonable fact finder could conclude the published statement declares or implies a provably false assertion of fact." (internal quotation marks and citations omitted)). These facts are a far cry from the vengeful comments posed to a personal website in the midst of a heated estate fight at issue in the *Nicosia* case Defendants rely on. *See Nicosia v. De Rooy*, 72 F. Supp. 2d 1093, 1104 (N.D. Cal. 1999).

If, however, the Court is concerned that any of the four statements might qualify as opinion statements, that question should be determined by a jury. *See Bently Rsrv. LP v. Papaliolios*, 218 Cal. App. 4th 418, 427 (2013) ("[I]f a statement is 'ambiguous and cannot be characterized as factual or nonfactual as a matter of law,' a jury must determine whether the statement contains an actionable assertion of fact." (quoting *Kahn v. Bower*, 232 Cal. App. 3d 1599, 1608 (1991)).

#### 3. All of Defendants' statements convey a defamatory meaning.

Defendants *concede* that 30 of the 35 challenged statements convey a defamatory meaning. *See* Mot. at 18–19 (challenging the defamatory meaning of only five statements). As to the remaining five statements,[8] the challenged language is susceptible to a defamatory meaning. *See Selleck v. Globe Int'l, Inc.*, 166 Cal. App. 3d 1123, 1131 (1985) (discussing that a court should not "rule that a publication cannot be defamatory on its face when by any reasonable interpretation the language is susceptible of a defamatory meaning"). Each of these five statements accuses Sky/Tek of being part of the so-called

[8] Compl. ¶¶ 91(iii), 95(ii), 95(iii), 95(iv), and 95(viii).

VexTrio and, according to Defendants' same publications, VexTrio is a criminal network. Therefore, each of these statements accuses Sky/Tek of criminal conduct, which is "[p]erhaps the clearest example of libel per se …." *Barnes-Hind, Inc. v. Super. Ct.*, 181 Cal. App. 3d 377, 385 (1986); Cal. Civ. Code § 45a ("A libel which is defamatory of the plaintiff without the necessity of explanatory matter, such as an inducement, innuendo or other extrinsic fact, is said to be a libel on its face.").

To try to avoid this conclusion, Defendants improperly strip the challenged statements of all context. *See Selleck*, 166 Cal. App. 3d at 1131 (The publication "must be read as a whole in order to understand its import and the effect that it was calculated to have on the reader, and construed in the light of the whole scope and apparent object of the writer" ) (citing *Corman v. Blanchard*, 211 Cal. App. 2d 126, 131–32 (1962)); *see also Resolute Forest*, 2023 WL 3568077, at *3 (same).

For instance, Defendants selectively cite the fact that Slide 24 of their Black Hat presentation does not specify that the entities listed are part of VexTrio, but the preceding slides make that clear. Slide 19 is titled "Los Pollos!" and says that "These are VexTrio validated domains." Ex. 3 at 19. Slide 20 appears to show clips from Los Pollos's website with the title "Breaking Bad. Fitting for VexTrio." Ex. 3 at 20. Slide 21 appears to show another clip from Los Pollos's website identifying Teknology, Tacolo.co, Adtrafico, and others with the title "Turns out some of these companies are one in the same . . . ." Ex. 3 at 21. Slide 22 reads, "Yup, these guys" with a screenshot from the Tacolo.co platform. Ex. 3 at 22. Slide 23 appears to show a chat asking whether Los Pollos is "white hat or black hat cpa" (Ex. 3 at 23), and then the audience reaches Slide 24 listing multiple entities, including Los Pollos, Tacolo.co, AdTrafico, AdsPro Group, Teknology, HolaCode, and Fidelity Mail, alongside a graphic that appears to show connections between each of them. Ex. 3 at 24. A reasonable reader clearly understands this presentation accuses Sky/Tek of being part of the criminal network described as VexTrio.

Similarly, the graphic identified in Paragraph 95(ii) of the Complaint identifies Plaintiffs in a map that supposedly shows the "relationship between key figures and select commercial entities that are evolved into what is known as VexTrio today." Compl. ¶ 95(ii), Ex. 4 at 9–10. In the graphic, Sky/Tek representatives are highlighted in red with many connection lines drawn between them. *Id.* ¶ 95(ii), Ex. 4 at 9–10. Defendants try to escape the clear meaning of this graphic by noting its disclaimer that "some listed individuals may not be involved *in the core VexTrio businesses*." *Id.* ¶ 95(ii) (emphasis added).

Whatever that vague disclaimer might mean, Plaintiffs have "provide[d] enough facts to state a claim to relief that is plausible on its face." *See Austin*, 925 F.3d at 1137.

Defendants' selective quoting from the defamatory statements in Paragraphs 95(iii) and (iv) are equally deceptive and ineffective. Defendants omit the bolded language from each:

- **"Like many of the individuals involved in VexTrio, [Los Pollos co-founder] Vassilev** tries to balance a professional appearance with an adrenaline-filled lifestyle." Compl. ¶ 95(iii).
- "**VexTrio has several Breaking Bad-themed entities under the AdsPro umbrella. HolaCode(holaco[.]de) is the software development group that is largely out of the public eye (Figure 14). According to online records, Hola Code DOO was registered in Montenegro in March 2022 by Cerutti. This group appears to have developers in several countries and a physical location in Montenegro. According to a Bosnian news article from 2024, HolaCode was among the most profitable software engineering micro-enterprises in the region. It is unrelated to the nonprofit organization HolaCode. A third company is TacoLoco, which** claims to process over 1 million requests per second, and is used for push monetization." *Id.* ¶ 95(iv).

Moreover, Defendants spread their false theory to Hetzner, Credit Suisse, UBS, and Cornèr Banca SA, which all canceled their contracts with Skyforge in late 2024 because of those defamatory statements, indicating that these business partners found these statements conveyed a defamatory meaning. *Id.* ¶ 74; *see Resolute Forest*, 2023 WL 3568077, at *4 ("Moreover, [the defendant's] arguments are refuted by evidence that some readers interpreted the Statements in their defamatory sense."). Sky/Tek's loss of revenue and user engagement following the publication of these defamatory statements also shows that readers understood the statements to be defamatory statements about Sky/Tek. *Id.* ¶ 124.

***

For these reasons, Plaintiffs sufficiently alleged each element of their defamation claim, and so Defendants' motions to strike and dismiss should be denied.

### C. The Complaint states a false light claim.

California law does *not* bar a corporate entity from asserting a false light claim, as Defendants contend. Defendants' exclusive reliance on *Holomaxx Technologies v. Microsoft Corp.* and *Kennedy*

*Funding Inc. v. Chapman* does not accurately represent California law on this point. Both of these non-binding cases rely on *Ion Equipment Corp. v. Nelson*, a 1980 decision in which a California appellate court concluded that the corporate entity could not bring a false light claim because it did not enjoy the right of privacy that gave rise to its claim. 110 Cal. App. 3d 868, 878–79 (1980). More recently, California courts have recognized that corporate entities do enjoy privacy rights, and so whether a corporate entity can sustain a false light claim turns on what right was damaged or infringed. *SCC Acquisitions, Inc. v. Super. Ct.*, 243 Cal. App. 4th 741, 756 (2015) (recognizing that the corporations have a right of privacy, though it is a lesser right than that held by human beings); *Brentwood Commc'ns Int'l Inc. v. Fully Torqued Prods. LLC*, 2025 Cal. Super. LEXIS 46239, at *10 (Cal. Super. Ct Aug. 1, 2025) ("Privacy rights accorded artificial entities are not stagnant, but depend on the circumstances.") (internal quotations and citation omitted).

The only damages the *Ion Equipment* plaintiff claimed in relation to the privacy claim stemmed from the defendant's secret recording of the plaintiff's confidential communications. 110 Cal. App. 3d at 878–79. No economic loss resulted from that privacy invasion. *See id.* The court held that because the corporation did not have "feelings" and a "peace of mind" that could be invaded by such a secret recording, it could not bring a privacy tort claim. *Id.* at 878. On the other hand, when a corporate entity suffers economic loss because of a violation of its privacy rights, it can sustain a tort claim to recover such damages. In *H&M Associates v. City of El Centro*, issued by the California appellate court the same year as *Ion Equipment*, the defendant published false information about the corporate entity plaintiff and, as a result, the plaintiff's property was foreclosed on, resulting in economic loss to the corporate plaintiff. 109 Cal. App. 3d 399, 404 (1980). The court recognized that "businesses, regardless of their legal form, have zones of privacy which may not be legitimately invaded" and concluded that the corporate plaintiff could sustain a privacy tort claim because it suffered economic harm, not harm to "feelings" or "peace of mind," which a corporate entity lacks. *Id.* at 410–11.

As in *H&M Associates*, Sky/Tek suffered economic loss because of Defendants portraying them in a false light. *See* Compl. ¶¶ 73–74, 124–128 (detailing the harm Sky/Tek suffered as a result of Defendants' actions, including loss of revenue and bank cancellations); 148 (claiming that Defendants' portrayal of Sky/Tek in a false light has resulted in "lost customers and revenue"). And so they can

sustain a false light claim under California law. Defendants have not otherwise challenged the sufficiency of Plaintiffs' false light allegations, and so the false light claim should not be stricken or dismissed.

**D. The Complaint states a claim for interference with contract .**

Both of Defendants' arguments to dismiss or strike the claim for interference with contract also fail. First, Defendants fail to identify what, if any, "First Amendment requirement" they contend is not satisfied. In any event, any First Amendment argument fails for the reasons already addressed.

Second, Defendants' sufficiency argument—that the claim does not sufficiently identify each of the parties with whom Plaintiffs contracted or allege the nature and extent of the contractual relationship—disregards the facts in the Complaint. The Complaint alleges that "business partners and banks terminated their relationships with Sky/Tek" because of Defendants' tortious conduct. Compl. ¶ 13. It describes how "Defendants contacted various domain registrars, hosting companies, and DNS security providers that they knew did business with Sky/Tek" and made "false and defamatory statements regarding Sky/Tek[]" in order "to persuade those third parties to cancel contracts with Sky/Tek." *Id.* ¶ 66. Defendants fault Plaintiffs for not naming the third parties with which they contracted, but Plaintiffs identified at least four such parties in the Complaint. *See id.* ¶ 153 ("Defendants specifically targeted entities with which Skyforge had contracts and that provided services for Skyforge, including Hetzner, Credit Suisse, UBS, and Corner Bank SA, for example."). Plaintiffs alleged that "Defendants' malicious contact with Hetzner, a web-hosting company based in Germany, caused Hetzner to cancel its contract with Sky/Tek." *Id.* ¶ 67; *see also id.* ¶ 154 (describing how Hetzner terminated its contract with Sky/Tek). Then, "Sky/Tek received notice from several of their banks—including Credit Suisse and UBS—that their accounts had been terminated." *Id.* ¶ 74.

California law does not require greater specification. In *UMG Recording, Inc. v. Global Eagle Entertainment, Inc.*, relied on by Defendants, the allegations failed because the nonmoving party alleged only that "they had 'Airline Contracts,'" and so the defendant could not determine "what contractual rights [they] possess[ed]'" that could be interfered with. 117 F. Supp. 3d 1092, 1115 (C.D. Cal. 2015). There is no such concern here. Sky/Tek identified the specific contractual relationships that Defendants have interfered with. Hetzner is a "web-hosting company"; "Sky/Tek received notice from Hetzner that its IP address had been reported as abusive and that its services would subsequently be cancelled."

Compl. ¶¶ 67, 154. Credit Suisse, UBS, and Corner Bank SA were Sky/Tek's banks, which terminated their accounts due to Defendants' defamatory conduct. *See id.* ¶¶ 74, 154. The Court can determine the contractual rights Defendants disrupted based on these allegations. *See, e.g.*, *Unite Eurotherapy, Inc. v. Walgreen Co.*, 2017 WL 513008, at *3 (S.D. Cal. Feb. 7, 2017) (allegations that "did not specifically identify a third party" but "did allege that one of its resellers has been selling its products to Defendants" in violation of its distribution agreement were "sufficient facts to demonstrate the existence of a valid contract between plaintiff and a third party").

**E. The Complaint states a Lanham Act claim.**

Defendants' first two arguments regarding the Lanham Act claim are undeveloped and blatantly ignore the allegations in Plaintiffs' complaint. Defendants first argue that Plaintiffs' allegations are conclusory but provide no support for that argument. Sky/Tek allege facts that, when proven true, will establish each element of their Lanham Act claim: "(1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement." *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997) (citation omitted); *see* Compl. ¶¶ 87, 91, 95, 98 100, 118, 161 (false statements that deceived Defendants' audience, including Sky/Tek's customers); 162 (statements occurred in interstate commerce); 73–74, 124–28, 163 (detailing the harm suffered by Sky/Tek as a result).

Defendants then focus on the falsity element, again without explaining how Sky/Tek failed to meet their pleading burden. As described above in Section III.B.2, the Complaint identifies each false statement and the facts that make each false. These allegations are sufficient to satisfy the falsity element of a Lanham Act claim. The Court's dismissal order in *Automated Pet Care Products, LLC v. PurLife Brands, Inc.*, which Defendants rely on, is inapplicable. In *Automated Pet Care Products,* the plaintiff failed to identify "any specific purportedly fake review posted by" defendant and failed to identify any statement, let alone a false one, made by the defendant. 703 F. Supp. 3d 1022, 1031–32 (N.D. Cal. 2023) (J. Pitts). Similarly, in *AccuImage Diagnostics Corp. v. Terarecon, Inc.*, the court dismissed the

plaintiff's Lanham Act claim because the complaint did not "allege any facts regarding the location, timing, or content of [defendant]'s allegedly false statements." 260 F. Supp. 2d 941, 948 (N.D. Cal. 2003). Defendants ignore these details in Plaintiffs' complaint.

Defendants' third argument—that Sky/Tek failed to allege how the challenged statements constitute "commercial advertising or promotion"—ignores the Complaint, too. The Complaint alleges that (1) because of Defendants' false statements, Sky/Tek lost sales, revenue, and contracts, and their brand reputations suffered harm, and (2) Defendants made these false statements to sell their products. *See* Compl. ¶¶ 42–57, 88, 96, 101, 124–128. These allegations place Sky/Tek's injuries within the Lanham Act's "zone of interests." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 131–32 (2014) ("[T]o come within the zone of interests in a suit for false advertising under [the Lanham Act] § 1125(a), a plaintiff must allege an injury to a commercial interest in reputation or sales."); *see also BBK Tobacco & Foods, LLP v. Aims Grp. USA Corp.*, 723 F. Supp. 3d 973, 985 (D. Nev. 2024) (finding that allegations of lost sales and diminished goodwill were sufficient to state a valid Lanham Act claim).

The challenged statements here are markedly different from the warning labels and fact-checks involved in the *Children's Health* case Defendants rely on. *See Children's Health Def. v. Facebook Inc.*, 546 F. Supp. 3d 909 (N.D. Cal. 2021). Those labels and fact-check posts did not purport to sell any of Facebook's products. *See id.* Here, on the other hand, Defendants publicly acknowledge that their blog is published and was used to market Infoblox's products. Compl. ¶¶ 42–57. Likewise, Defendants published false and defamatory statements about Plaintiffs when marketing Infoblox's products at industry conferences. The challenged statements here were all made within the context of selling Defendant Infoblox's DNS Threat Intelligence Product. *See, e.g.*, Compl. ¶¶ 5, 46, 49, 52. Therefore, the Complaint adequately alleges that the challenged statements constitute "commercial advertising or promotion." *See Pegasystems, Inc. v. Appian Corp.*, 463 F. Supp. 3d 152, 164 (D. Mass. 2020) (finding a LinkedIn post was "commercial advertising or promotion" because "it was made with the intent of influencing potential customers to purchase Defendants' goods or services") (internal quotations removed). Sky/Tek's Lanham Act claim therefore should not be dismissed; it is not subject to Defendants' motion to strike.

**F. The Complaint states a civil conspiracy claim.**

Finally, Defendants' argument that civil conspiracy is not a standalone cause of action misrepresents California law and again misrepresents the Complaint allegations. Plaintiffs' civil conspiracy claim is designed to hold Defendants to account for the tortious conduct of third parties with whom Defendants conspired: web hosting services, domain name registrars, banks, and other industry actors who collaborated with Defendants to try to shut down Plaintiffs' businesses. Sky/Tek allege that Defendants engaged in a conspiracy with these third parties "to engage in the unlawful acts alleged herein, including defamation, false light, intentional interference with contract, and trade libel." Compl. ¶ 166; *see L.A. Mem'l Coliseum Comm'n v. Insomniac, Inc.*, 233 Cal. App. 4th 803, 834 (2015) (overturning trial court's demurer of conspiracy claim because plaintiffs adequately alleged there was an underlying tort by a co-conspirator and that the defendants conspired with the party who committed the tort).

The cases Defendants rely on are irrelevant. In *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*, the court dismissed the conspiracy claim because there was no underlying tort as to the defendant—a party to a contract cannot be liable for interfering with that contract, and so that party cannot be held liable for conspiracy to interfere with the contract. 7 Cal. 4th 503, 514 (1994). In *Matthews v. Apple, Inc.*, the plaintiff's civil conspiracy claim focused on the wrongful actions of the defendant, not the co-conspirators. *See Matthews v. Apple, Inc.*, No. 4:24-cv-00272-JST (N.D. Cal. Jan. 16, 2024) ("Defendant Apple was aware"; "Defendant Apple has acted with malice towards Plaintiff"; "Because Defendant Apple is guilty of conspiring to harm Plaintiff …."). To the contrary, Sky/Tek alleged that nonparty conspirators defamed Sky/Tek, hacked Teknology's servers, and initiated a negative SEO campaign against Los Pollos's primary domain name. Compl. ¶¶ 64, 71–73. Thus, Sky/Tek do not allege their civil conspiracy as a standalone cause of action, and so the civil conspiracy claim must stand.

**G. The Court has personal jurisdiction over Defendant Burton.**

This Court can and should exercise personal jurisdiction over Burton. The Complaint's allegations are more than sufficient to establish the requisite minimum contacts with California. Burton, an executive of a California company (Infoblox), worked hand-in-hand with and for Infoblox to orchestrate a defamatory public campaign against Sky/Tek, and at times she was physically present in California while doing so. None of those allegations are disputed in Burton's declaration. Indeed, the

declaration's vague, narrowly crafted statements raise more questions than answers. And if the declaration creates any doubts about Burton's suit-related California contacts, the proper course of action is jurisdictional discovery—not dismissal.

**1. The Complaint makes a prima facie showing of jurisdiction.**

To begin, the Complaint establishes that Burton has "minimum contacts with [California] such that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice." *Glob. Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101, 1106 (9th Cir. 2020) (internal quotations and citations omitted). California's long-arm statute "allows the exercise of personal jurisdiction to the full extent permissible under the U.S. Constitution" and so jurisdictional analysis under state and federal law are the same. *Buchanan v. Soto*, 241 Cal. App. 4th 1353, 1361–62 (2015) (internal citations and quotation marks omitted). That analysis focuses on three criteria, each satisfied here: (1) Burton purposefully availed herself of the privilege of conducting activities here, (2) Sky/Tek's claims arise out of Burton's California publications and marketing efforts, and, (3) based on Burton's activities, she should reasonably expect to be called to account for her conduct in a California court. *See CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1076 (9th Cir. 2011).

Burton spearheaded a massive public smear campaign against Sky/Tek. Compl. ¶¶ 4–11, 16–17, 20. In her capacity as an executive of a California company, Burton authored the defamatory blog posts giving rise to this lawsuit, she controlled and directly participated in the charged wrongdoing, and she used the California company's platform, resources, brand, website, and personnel when doing so. *Id.* ¶¶ 20, 51–55, 81–83. In all of her defamatory statements identified in the Complaint, Burton was speaking or writing on behalf of Infoblox and in her capacity as one of its vice presidents. For instance, the defamatory blog posts are all hosted on Infoblox.com. *Id.* ¶¶ 85, 94, 99. And she made defamatory posts on her professional LinkedIn account associated with Infoblox. *Id.* ¶ 113. Burton not only authored the defamatory articles and posts but also participated in at least one California cybersecurity conference to promote Infoblox's DNS products aimed at disrupting the so-called VexTrio. *Id.* ¶¶ 20, 89–90. Regardless of where Burton was physically located, she used the instrumentalities and resources of a California-based company as a vessel for her tortious conduct.

That said, Burton *admits* that she has physically traveled to California six times during the last two years alone, Dkt. 39-1 ¶¶ 7–8, and *at least* one of those trips was part of her "VexTrio" project. Compl. ¶ 20. Burton also *admits* that at least one of her Infoblox "VexTrio" colleagues is based in California. Dkt. 39-1 ¶ 6. On information and belief, that person is Dave Mitchell, who is based in San Francisco and who specifically participated in an industry conference presentation where Infoblox falsely named Sky/Tek as part of VexTrio. Compl. ¶ 117–118. Mitchell also participated in Burton and Infoblox's "collaboration" with industry players to deplatform Sky/Tek. *Id.* ¶ 83.

Those facts are more than enough to establish that Burton purposefully availed herself of California's benefits. *See Swenberg v. dmarcian, Inc.*, 68 Cal. App. 5th 280, 296–99 (2021) (exercising personal jurisdiction over a Dutch resident because he was an executive of a California company who (1) "publicly presented himself as a leader" of the company; (2) had the company's EU website route to the website administered in California; and (3) "made economic use" of his relationship with the California company.). Burton's direct, personal orchestration of a tortious campaign carried out by a California company is a strong basis for jurisdiction; she cannot hide behind the company's banner. *See Calder v. Jones*, 465 U.S. 783, 789–90 (1984) ("Petitioners are correct that their contacts with California are not to be judged according to their employer's activities there. On the other hand, their status as employees does not somehow insulate them from jurisdiction. Each defendant's contacts with the forum State must be assessed individually.").[9]

Moreover, Sky/Tek's claims arise from Burton's activity in California. If not for Burton's contacts with California—authoring statements to be published on a California company's website—Sky/Tek would not have suffered from her tortious conduct. *See Nicosia*, 72 F. Supp. 2d at 1099 (finding personal jurisdiction over Washington resident who circulated defamatory material to just eleven

[9] Burton's cases are nothing like this one. *See Mulato v. Wells Fargo*, 76 F. Supp. 3d 929, 945 (N.D. Cal. 2014) (no personal jurisdiction over employee defendants because they simply worked for in-state employer and did not control or directly participate in the alleged activities); *Davis v. Metro Prods., Inc.*, 885 F.2d 515, 520 (9th Cir. 1989) (same); *Sussman v. Playa Grande Resort, S.A. DE C.V.*, 839 F. App'x 166, 167 (9th Cir. 2021) (no jurisdiction based on a letter that "concerned a dispute over a timeshare in Mexico" that potentially inflicted harm on Washington residents and that was "not circulated in California or read by anyone residing in California."); *Davis v. Cranfield Aero. Sols., Ltd.*, 71 F.4th 1154, 1161–62 (9th Cir. 2023) (applying the "purposeful direction" test, not the "purposeful availment" test relevant here).

California addresses because "[b]ut for [defendant]'s posting of her articles on her web-site and sending e-mails to Californians, [plaintiff]'s claims against [defendant] would not have arisen").

**2. Burton's declaration does not refute Plaintiffs' jurisdictional allegations.**

Burton chose to submit a declaration in support of her personal jurisdiction argument. *See* Dkt. 39-1. But the declaration says very little, and it certainly does not dispute any of the facts alleged in the Complaint. For instance, it does not deny that Burton's campaign against Sky/Tek was funneled through the infrastructure of Infoblox, a California company. Nor does it deny that Burton physically visited California at least once as part of that effort. Moreover, the declaration admits that at least one of Burton's "Threat Intelligence" colleagues is based in California. *Id.* ¶ 6. But perhaps most revealing, Burton does not say the simplest thing that might aid her: that her California contacts and activities are unrelated to the allegations. If she could truthfully have made that statement, she would have—but she didn't.

Indeed, Burton's vague, carefully worded declaration raises more questions than answers. While she says that only one employee on her "team" is based in California, she does not explain why her "team" is the only relevant population, and she says nothing about other Infoblox employees who are involved in her "VexTrio" project. *Id.* And she fails to deny that the California employee on her "team" is involved in the Complaint's allegations. Moreover, Burton admits that she was in California six times over the last two years, and she does not deny that she worked on VexTrio while she was here. Nor does she say whether her trips lasted for days, weeks, or months. Simply put, Burton's declaration leaves open the very real scenario that she worked extensively in California on the VexTrio project, both in-person and remotely, and that she did so with one or more California-based individuals. That is what the Complaint alleges, and Burton does not refute it.

**3. Burton cannot present a "compelling case" against exercising jurisdiction.**

Because Sky/Tek have satisfied the first and second jurisdictional requirements, the burden shifts to Burton to "present a compelling case" that it would be unreasonable for this Court to exercise personal jurisdiction. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985). Burton has not met, and cannot meet, this burden. Burton intentionally published her defamatory statements in California to encourage potential customers to purchase services and products from her California-based employer. Burton's collaboration with California-based colleagues and her travel to the state confirm that "modern

transportation and communications have made it much less burdensome for a party sued to defend h[er]self in a State where [s]he engages in economic activity." *See id.* at 474 (internal quotations and citation removed). And even if Burton had to physically appear in this Court, it is a short flight from her residence in Seattle. Thus, it is fair to subject her to the jurisdiction of California courts for purposes of this litigation. For these reasons, the Court can and should exercise personal jurisdiction over Burton.

If, however, the Court has any doubt, Sky/Tek should be allowed to conduct jurisdictional discovery. *See Gillespie v. Prestige Royal Liquors Corp.*, 183 F. Supp. 3d 996, 1003 (N.D. Cal. 2016) (denying motion to dismiss without prejudice and ordering jurisdictional discovery because plaintiffs "demonstrated more than a 'hunch' that discovery will reveal jurisdictionally relevant facts"). Such discovery would, at a minimum, probe the gaps and glaring omissions created by Burton's strategically evasive and carefully crafted declaration (which contains only seven substantive sentences).

## IV. CONCLUSION

This is not a close call. Defendants cannot shield their false statements, made for the purpose of marketing their products and services, behind the protection of anti-SLAPP. The Complaint carefully and thoroughly describes a series of defamatory statements by Defendants that have wreaked havoc on Sky/Tek's business and reputation, all because Defendants prioritized profits over facts. The Complaint pleads defamation by identifying numerous, specific statements of fact that expressly accuse Sky/Tek of criminal activity and other wrongful conduct, and the Complaint painstakingly explains why these statements are false. For similar reasons, the Complaint more than adequately pleads other torts as well. Thus, the Complaint does all that is necessary at this early stage: it "provide[s] 'enough facts to state a claim to relief that is plausible on its face.'" *Austin v. Univ. of Or.*, 925 F.3d at 1137 (quoting *Bell*, 550 U.S. at 570).

Accordingly, the Court should deny Defendants' anti-SLAPP motion, deny Defendants' 12(b)(6) motion to dismiss, and deny Defendant Burton's 12(b)(2) motion to dismiss.

Dated: February 13, 2026

WINSTON & STRAWN LLP
By: */s/ Sean G. Wieber*

Kevin P. Simpson (SBN: 344644)
KPSimpson@winston.com
**WINSTON & STRAWN LLP**
333 S. Grand Ave., 38th Fl.
Los Angeles, CA 90071
Telephone: (213) 615-1700
Fax: (213) 615-1750

Sean G. Wieber (admitted *pro hac vice*)
SWieber@winston.com
Elizabeth S. Deshaies (admitted *pro hac vice*)
LDeshaies@winston.com
Patrick G. Simonaitis (admitted *pro hac vice*)
PSimonaitis@winston.com
**WINSTON & STRAWN LLP**
300 N. LaSalle Dr., Suite 4400
Chicago, IL 60654
Telephone: (312) 558-5600
Fax: (312) 558-5700

Dana Cook-Milligan (SBN: 301340)
DLCook@winston.com
**WINSTON & STRAWN LLP**
101 California St., 21st Fl.
San Francisco, CA 94111
Telephone: (415) 591-1000
Fax: (415) 591-1400

*Attorneys for Skyforge Digital AG and Teknology SA*