UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable P. Casey Pitts, Judge

SKYFORGE DIGITAL AG, a Switzerland corporation, et al.)
)
Plaintiffs, )
)
VS. ) **NO. C 25-09502 PCP**
)
INFOBLOX, INC., a Delaware corporation, et al., )
)
Defendants. )
)

San Francisco, California
Thursday, March 26, 2026

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

WINSTON & STRAWN LLP
300 North LaSalle Drive - Suite 4400
Chicago, Illinois 60654
**BY: SEAN G. WIEBER, ATTORNEY AT LAW**

WINSTON & STRAWN LLP
333 South Grand Avenue
Los Angeles, California 90071
**KEVIN SIMPSON, ATTORNEY AT LAW**

For Defendants:

GREENBERG TRAURIG LLP
54 State Street - 6th Floor
Albany, New York 12207
**BY: MICHAEL GRYGIEL, ATTORNEY AT LAW**
**KELLY L. MCNAMEE, ATTORNEY AT LAW**

Remotely Reported: Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
U.S. District Court - Official Reporter

**Thursday - March 26, 2026** **10:03 a.m.**

**P R O C E E D I N G S**

**---000---**

**THE CLERK:** Now calling 25-CV-9502, Skyforge Digital AG, et al. v. Infoblox, Inc., et al.

May I please have appearances beginning with the Plaintiff.

**THE COURT:** You can approach the podium as well. We have a virtual court reporter today so she can see you as you are speaking.

**MR. WIEBER:** Good morning, Your Honor, pleasure to meet you. I'm Sean Wieber from Winston & Strawn on behalf of both Plaintiffs.

**THE COURT:** Okay, good morning.

**MR. SIMPSON:** Good morning, Your Honor, Kevin Simpson, also of Winston & Strawn on behalf of the Plaintiffs.

**THE COURT:** Good morning.

**MR. GRYGIEL:** Good morning, Judge Pitts, Michael Grygiel from Greenberg Traurig in Albany, New York representing the Defendants Infoblox and Dr. Renee Burton. And with me today is my law partner Kelly McNamee who worked on the briefing.

**THE COURT:** Okay. Good morning. So, we are here on Defendants' motion to dismiss and motion to stay discovery.

I will hear from Defendants first since they are the

moving party. I do think that the focus of the argument today should really be the 12(b)(6) motion. I don't think I need a lot of additional argument on the 12(b)(2) motion and a motion to stay discovery. So, I think I would focus on those issues for today's purposes.

(Pause in proceedings.)

**MR. GRYGIEL:** Good morning. May it please the Court, and we are happy to focus on the 12(b)(6) arguments, Judge Pitts.

And first, I would like to begin with our position that there is -- based on the allegations in the complaint -- simply no way to exercise personal jurisdiction over Dr. Burton, the individual Defendant.

**THE COURT:** Right. As I said, I think that was a 12(b)(2) argument that I don't think I need --

**MR. GRYGIEL:** I'm sorry.

**THE COURT:** I was treating that as a 12(b)(2) argument over which --

**MR. GRYGIEL:** So, you want to separate the 12(b)(2) from the 12(b)(6) --

**THE COURT:** Yeah, I think the 12(b)(6) issues, the merits issues are what I think I would value most benefit from argument on.

**MR. GRYGIEL:** I'm more than happy to do that.

As a starting point, Your Honor, our merits based

arguments are premised on the application of California's Anti-SLAPP law. And, as the Court is aware from our briefing and what we have already had in our motion papers, California's Anti-SLAPP law clearly applies in this instance because the challenged statements directly implicate an issue of public interest by reporting threat intelligence information that warns of compromised website platforms and malware sources. The challenged statements that are at issue in the case really protect the integrity of the global online advertising space.

**THE COURT:** So, why doesn't the commercial speech exception to California's Anti-SLAPP --

**MR. GRYGIEL:** The answer to that, Judge Pitts, is simple and straightforward. Based on the *Motekaitis*, the USI insurance company case that we cited, which is a Northern District California case from 2025, the law in California on this could hardly be clearer. The commercial speech exemption only applies where the parties are business competitors.

And even according to the allegations in the complaint, that's simply not the situation here. In their opposing papers, the Plaintiffs cite a case called -- I'm not sure I will pronounce the names correctly -- *Xu v. Huang*, X-U-V-H-A-U-N-G -- and the *Motekaitis* case cited that for the proposition that we are urging on the Court.

And if the Court looks at the *Xu* case, there the plaintiff and the defendant were also operating in the exact same

commercial market. They were selling insurance products to the Chinese/American community. We simply do not have that situation here, Judge Pitts. The Plaintiff and the Defendant are engaged in entirely separate and distinct business operations.

**THE COURT:** Well, so what's -- and what is the language of the -- I mean, you know, Northern -- to be -- what really matters when I'm construing California state law is the language of the statute itself and California State court decisions that have applied that language. That's -- you know, even then if -- the Court of Appeal is persuasive but I will follow it unless I think the California Supreme Court would do something else; but that's the most relevant authority.

So, what in the language of this exception or in California State case decisions establishes that that's the proper construction of the exception?

**MR. GRYGIEL:** I don't have the language of the statute in front of me, Your Honor, but I do know the relevant provision has been repeatedly interpreted by California State law decisions to apply only in a commercially competitive situation.

**THE COURT:** Okay. And so, what are those California State court decisions?

**MR. GRYGIEL:** I believe we cited those in our brief, Judge Pitts. And if the Court requires additional briefing on

that point, we would be happy to submit it.

**THE COURT:** Okay. Let me just take a look if we are going to start there. I mean, I think there is also a question -- ultimately, I don't think -- you know, we are here in federal court. So, I'm not sure that the application of the Anti-SLAPP laws particularly relevant to much other than, you know, the possibility of an attorneys' fees motion down the road.

It is -- you know, there's still an ongoing intense dispute in the Ninth Circuit about whether it applies in any respect in federal court, but as the court -- one of the concurrences in the recent en banc decision noted that -- effectively all that now remains of the Anti-SLAPP laws applied in federal court is that attorneys' fees provisions. So, I'm not sure it has any -- you know, I have to apply the 12(b)(6) standard at this point because the Federal Rules --

**MR. GRYGIEL:** We certainly don't disagree with that, Your Honor. I read the Ninth Circuit cases and the other federal district court cases in California that we cited in our briefing -- when they do apply the Anti-SLAPP law and diversity context to a State tort law claim is saying where you are challenging the legal sufficiency of the pleading, certainly the Anti-SLAPP law doesn't displace the controlling 12(b)(6) standard. And the appropriate substantive analysis collapses into the *Iqbal/Twombly* pleading requirements. And that's

precisely what we are urging on the Court here.

**THE COURT:** Okay. So, I mean, I guess -- and that's what I'm saying. So, I'm not sure, again, that the whole issue on whether it applies or not, I mean, it seems to only be relevant to the question of whether you might at some point be entitled to attorneys' fees; right?

**MR. GRYGIEL:** Well, correct, Judge. The 12(b)(6) pleading standard is the same even under the applicability of the California Anti-SLAPP law in this context. That is correct.

**THE COURT:** I mean, I'm looking at the brief and I do see, you know, a decision from my colleague, Judge Seeborg; but that's the extent I think of the briefing that has been provided on this issue.

But let's turn -- so, let's turn to the merits under 12(b)(6).

**MR. GRYGIEL:** Okay. The first point I would like to make, Your Honor, on the merits is -- concerns the "of and concerning" element of a defamation claim, which is a fundamental element when a plaintiff asserts a defamation claim, the burden is on the plaintiff to plead that the allegedly actionable statement or publication is about the plaintiff. And that is a threshold question of law for the Court.

In California it's governed by a strict two-part test. To

survive a Rule 12(b)(6) motion to dismiss on these grounds, the plaintiff has to -- and where a statement is ambiguous on its face or does not otherwise identify a defamation plaintiff, there's two steps that have to be met by the plaintiff.

The statement has to be capable of being understood as concerning the plaintiff. And, secondly, the complaint must allege that the statement was actually understood by a third party as referring to the plaintiff.

And that second step, Your Honor, is entirely missing from the complaint; and I'm taking --

**THE COURT:** Well, I mean, there were -- substantively the requirement may be that it is both -- there is -- a reasonable percipient of the statement would understand it to be about the plaintiff and that there must at least be someone who actually understood it that way. So, that may be the substantive requirements.

As a pleading matter, we are here under Rule 12(b)(6) and under the federal. So, the question is just whether the complaint gives rise to the plausible inference that it was so understood by an actual individual.

So, I think that -- the focus has to be -- I'm not sure -- and, again, part of that is that, you know, if otherwise -- if all they have to do is add a single paragraph to this complaint, the statements in X, X, X and X were actually understood to be about Skynet [sic], if it is already plausible

I'm not sure that there's -- that we -- there is a requirement that we go the formality of having them add one sentence to each of these paragraphs throughout the complaint.

**MR. GRYGIEL:** I read the Ninth Circuit case, Your Honor, that we cited in the *SDV/ACCI v. AT&T Corp*. from 2008 as requiring that there be a pleading saying there is a third party who understood the allegation to be referring to the plaintiff and to identify who that party is.

And here, again, we simply don't have that. What we have is an allegation in complaint paragraph 154, that four business partners cancelled contracts with Skyforge during the period from November 15 to December 16 of 2024.

Thus, according to the argument that I understand Plaintiffs to be making, those business partners must have recognized the challenge statements were about the Plaintiffs. The problem, Your Honor, is that the timeline simply doesn't work.

**THE COURT:** Well, but again, if they were to say and everyone at the conference where the presentation was given understood that when they were referring to Los Pollos or Taco Loco or these things operated by the companies or using the servers of the companies, that that was understood as a reference to Sky/Tek. I mean, that would satisfy the requirement; right?

**MR. GRYGIEL:** Our position, Your Honor, is that

collapses the prong 1 of the part of the analysis and the prong 2, and there has to be an allegation that there was a specific --

**THE COURT:** No. Like I said, they could -- I'm not -- so, your theory is they have to not only allege that the individuals at the conference understood the language in that way but also somehow provide some additional allegations showing that those people understood it --

**MR. GRYGIEL:** They should --

**THE COURT:** -- as a matter of plausibility?

**MR. GRYGIEL:** Yes, there should be some additional allegation to flesh out the facts that support that claim, Your Honor, because otherwise there really isn't much of a distinction here between prong 1 and prong 2.

**THE COURT:** Well, no, there would be in the sense that a -- you know, a tree falls in a forest and no one is around to hear it. The fact that the tree fell is not enough.

You make a statement about -- a defamatory statement about someone that is originally attributed to someone but in a context that no one actually ever heard it, you could see that's what prong 2 is doing is saying that there actually has to be -- it actually has to be understood and it actually has to be so understood.

**MR. GRYGIEL:** And again, Your Honor, I read the *AT&T* case as imposing a stricter requirement; that the complaint

must allege the statement was actually understood by a third party as referring to the plaintiff. There is no such allegation in this complaint. And to try to get around that strict requirement, the Plaintiffs again have this broad allegation in paragraph 154 that four business partners understood certain statements as referring to the Plaintiffs because they cancelled business contracts; but the problem for the Plaintiffs in making that argument is that the cancellations took place many months before a single word was published about either Plaintiff that is at issue in this case. So, the timeline simply doesn't hang together.

Now, to move off of that, Judge Pitts -- and I may be misreading the arguments that the Plaintiffs are trying to make here -- but then they say, we are tacitly acknowledging that we haven't met -- that they haven't met the *AT&T* pleading standard.

They rely on *Dickinson v. Cosby*. They say that there is -- it is permissible to satisfy prong 2 that there is indirect evidence or circumstantial evidence that a third party understood the statements at issue as referring to the Plaintiff.

That case, though, Judge Pitts, does not help the Plaintiffs. It is factually distinguishable. There, the actress Janice Dickinson went on a national morning television program, identified Bill Cosby as a sexual assaulter and

perhaps even something stronger than that. Two days later Cosby's lawyer, Martin Singer, issues a press release accusing all of the women who have come out against Bill Cosby as being fantastical liars. It did not refer to Janice Dickinson. But it was only issued two days later, so it was clearly reasonable to understand that the statements in the press release did incorporate implicitly a reference to Janice Dickinson.

Equally important, Judge, that case is an evidentiary Anti-SLAPP motion. So, there is a great deal of evidence in the record on the motion and affidavits of people saying we understood this reference in Martin Singer's press release to include being about Janice Dickinson.

**THE COURT:** I mean, I guess -- again, we are here on the 12(b)(6) standard, which is all that matters at this point.

**MR. GRYGIEL:** Yeah.

**THE COURT:** And so --

**MR. GRYGIEL:** And --

**THE COURT:** And that's the motion. So, the question -- it's hard for me to see how they -- you know, adding an allegation that not only were these statements reasonably capable of being understood to be about Skynet [sic] but that the individuals at the conference who received -- you know, who were at that conference or individuals who read the blog post actually understood it to be about Skynet. I mean, why does that not satisfy the burden?

**MR. GRYGIEL:** Well, if that is the approach, Your Honor, then that would, I think -- in a very dramatic way -- relax the burdening requirement that we understand *AT&T* to --

**THE COURT:** Well, I mean it is all *Iqbal/Twombly*. The pleading requirement is established by the substantive law that applies and --

**MR. GRYGIEL:** Understood.

**THE COURT:** -- by Rule 12(b)(6) and the applicable standards; correct? I mean, I don't think they were -- was the Ninth Circuit proposing to adopt a different standard that then --

**MR. GRYGIEL:** Oh, no.

**THE COURT:** -- that might otherwise apply?

**MR. GRYGIEL:** We are clearly not taking that position, Judge Pitts. So, yes, what governs the application of the "of and concerning" requirement here and determining whether or not what is alleged in the current version of the complaint is whether or not the plausibility standard under *Iqbal* and *Twombly* is satisfied. No disagreement on that.

Our position is based on the controlling requirements that established that the "of and concerning" element of a defamation claim is quite strict.

**THE COURT:** Remind me, what were the specific statements and circumstances at issue in the *AT&T* case.

**MR. GRYGIEL:** *AT&T*, Your Honor, I'm -- I have read a ton of cases in the past few days. Please forgive me.

**THE COURT:** I understand.

**MR. GRYGIEL:** The immediate factual circumstances are slipping out of my mind; but as I read the case there, it was quite clear of what the court was requiring.

**THE COURT:** Well, no, but it matters because -- because decisions -- as one of my colleagues -- one of my Ninth Circuit colleague reminds me in a class we are teaching at UCSF Law right now is that decisions are not statutes and opinions are not statutes. And so, you have to read anything about -- any statement about a standard or otherwise in the context of the overall case and the facts that give rise to that particular statement, there's a risk of taking language out of context that purporting to establish a rule that in context is not actually establishing the rule. It is explaining the application of the rule to the facts of the case which is why I ask about the particular facts.

**MR. GRYGIEL:** Yeah -- just picked up the decision, Your Honor, triggered my memory. My apologies. It was a case where two individual plaintiffs in the case named *Metz* were alleging that a statement that was about a corporate entity that they were involved in defamed them, and the court rejected that allegation and said they failed to meet the "of and concerning" requirement.

**THE COURT:** Okay. So, it wasn't -- it wasn't a circumstance involving statements about the products that were -- you know, products that were offered by the particular companies at issue or individuals at issue?

**MR. GRYGIEL:** That is correct, Your Honor. Here is the sentence that we fastened on in our briefing is to proceed with their individuals, the Metzes must show not only that the statement could reasonably be understood as referring to them as individuals but that some third party understood the statement in this way.

**THE COURT:** Right. And here, the question -- so, again, if they plead that by saying the statements were so understood that -- for 12(b)(6) -- I mean --

**MR. GRYGIEL:** I think Metz is a little tighter with respect, Judge Pitts, because it says the Metzes have to show that a third party actually understood the statement --

**THE COURT:** Well, they don't have to show anything on a 12(b)(6) motion. They have to allege --

(Simultaneous crosstalk.)

**MR. GRYGIEL:** Yeah, allege. I'm taking the language from the opinion.

(Simultaneous crosstalk.)

**THE COURT:** I understand. So, there is a different question. I mean -- so, I mean, these are relevant distinctions in determining what the scope of the rule that the

Ninth Circuit announces in that case.

**MR. GRYGIEL:** And no quarrel from Defendants on that point, Your Honor. I'm just taking the language as it is expressly written in the opinion.

**THE COURT:** Okay. So, I mean, I understand your argument on that point. Let's -- I mean, why haven't they at least adequately alleged falsity as to the statements that they are challenging?

**MR. GRYGIEL:** And the answer for that is clear, Judge Pitts. In order to get past a 12(b)(6) motion in alleging falsity, it is insufficient simply to have a litany of statements alleged to be actionable preceded by a conclusory allegation of falsity.

And here, as you look at their opposition papers, rather than, as they are required to do under *Iqbal/Twombly* in order to get past the 12(b)(6) motion, they have to plead facts that show why each of the 35 challenged statements individually is false.

They don't do that. They come back in their opposition and repackage the 35 statements into six revamped claims in contriving a narrative of falsity.

A couple of problems with that that are fundamental, Judge Pitts. First, their categories, their reclassifications, misrepresent what the actual statements say.

And second -- and even equally as important -- that's not

how defamation law works. In order to apply *Iqbal/Twombly* faithfully here in this context, there has to be a specific factual pleading with respect to each statement demonstrating its falsity; and we don't have that here.

And the case, Judge Pitts, that I would emphasize to Your Honor is --

**THE COURT:** Make sure -- because we have a virtual court reporter, you will just need to make sure that everything is into the microphone.

**MR. GRYGIEL:** I'm sorry, Your Honor. The case I would emphasize is the -- and I realize I have some trepidation as a New York law coming into a California federal court and urging a California judge to apply a New York case -- but this is a federal district course from the Southern District, *1st Amendment Praetorian v. New York Times Company*; and the argument that is made by the plaintiffs in this case to satisfy their burden of pleading falsity under *Iqbal/Twombly* is precisely the approach that was rejected by the *Praetorian* case.

Here, the Plaintiffs in the *1st Amendment Praetorian* case put out two broad disclaimers and said -- they were an extremist group. And according to what they sued The Times over, there was alleged reporting that identified them as being involved in participating in the January 6 attack. They issued two statements saying, "We are a lawful organization. We are

not violent. We had no involvement in this."

And the Southern District of New York, in reasoning that we would submit is directly applicable here, rejected that approach and said these broad issues that you are a lawful company is simply insufficient to discharge your burden under *Iqbal/Twombly* of demonstrating through specifically pleaded facts that the individual statements are false.

And we submit that case should apply here.

**THE COURT:** Why -- even -- separate and apart from the question of defamation claims, you know, that -- under the Lanham Act, a false statement that may literally be true but if it is likely to mislead or confuse consumers, it may be actionable. So, why haven't they, at the very least, satisfied that requirement of the Lanham Act?

**MR. GRYGIEL:** Your Honor, I just -- first of all, different standards. Lanham Act, statutory claim. Here, they have to comply with the First Amendment --

**THE COURT:** They have a Lanham Act claim.

**MR. GRYGIEL:** Yes, understood.

**THE COURT:** So, I'm not asking about the Lanham Act claim. Why -- so, turning to the question of falsity as to the Lanham Act claim, why haven't they satisfied that different standard.

**MR. GRYGIEL:** For the same reason, Judge Pitts. They simply haven't alleged specifically factual falsity that is

required under *Iqbal/Twombly*.

**THE COURT:** Well, no, they don't have to; right. The statements just have to plausibly be likely to mislead or confuse consumers. So, it is a different standard. I don't think the standard of having to specifically say this is false necessarily applies in the Lanham Act. They just have to say this is misleading.

**MR. GRYGIEL:** I agree with that; that certainly the standard is different and arguably more rigorous in the defamation context and under the statutory Lanham Act.

**THE COURT:** Pretty clearly more rigorous.

**MR. GRYGIEL:** Yeah.

**THE COURT:** So, again, why haven't they satisfied that requirement here as to their Lanham Act claim?

**MR. GRYGIEL:** Well, Your Honor, I think that we still submit -- for the reasons I have identified with respect to the falsity element, I don't see the statements as necessarily being misleading here and -- for the reasons we briefed.

And also on the Lanham Act claim, I don't think you can meet the element that this is commercial advertising or promotion. These are -- if you have -- I'm sure the Court has read the statements here. They were delivered in blog postings posted to the website of our client Infoblox. They were made at IT conferences. They are highly technical presentations with fairly granular reporting. It doesn't in any way to me,

Judge Pitts, remotely come close to commercial advertising.

**THE COURT:** Let me -- and I understand that argument. There is a question of is now the time to resolve that. I mean, they have provided a lot of allegations explaining how they -- for the reasons they do think this is commercial speech in the sense that it's offered and all of this is done to sort of build interest in their products and their services; and that they are effectively, you know, using these conferences and these blog posts to advertise their own ability to help protect people against these things. And so, that's their theory.

I guess there's a question on, you know, is that amount -- is that something that can be decided as a matter of law on a Rule 12(b)(6) motion or is that something that is more appropriately decided on an evidentiary record where we actually -- you know, you may rebut some of the -- the characterizations that they have made about those -- the context. You can provide additional evidence that would say that that is not what, in fact, is happening at these conferences and the purposes of the speeches at the conference.

You know, is that a factual issue that is not really properly before me at this time.

**MR. GRYGIEL:** No. We submit, Your Honor, that it's a question of law that can be determined at the pleading stage; and the reason for that is the determination of whether or not

this qualifies as commercial advertising or promotional material under the Lanham Act is determined based on looking at the statements themselves, the content, that's alleged to be actionable in this case.

Now, I can't sit here with a straight face and say to the Court that by delivering these statements and reciting her research in various formats and IT conferences was there a motive on the part of the Defendants to perhaps, secure some sort of commercial advantage? Perhaps. But it doesn't mean that what she was actually saying about the Plaintiffs and the statements that are alleged to be actionable in the complaint themselves qualify as commercial advertising or promotions.

**THE COURT:** They were on their website; correct? I mean, maybe there is a meaningful distinction here between the speech and the statements on the website.

**MR. GRYGIEL:** I -- Your Honor, our position is that the statements on the website are certainly available to anybody to look at. It doesn't convert the content into commercial advertising or promotions sufficient to satisfy a Lanham Act claim.

**THE COURT:** Presumably that's the main reason people maintain websites, for-profit businesses maintain websites. I mean, they are not challenging a Reddit posting about these materials or a -- you know, a discussion on some other generalized forum or an article that was published in a -- you

know, a journal of some kind. I mean, these are -- the blog maintained on the website which presumably is done for some commercial purpose.

**MR. GRYGIEL:** We still think there is a distinction to be made, Your Honor, based on the actual content of the statements because here, I would submit to the Court, that Dr. Burton -- in engaging in her research and publishing activity -- she was really functioning as a quasi journalist or consumer protection advocate.

So, again, the statements themselves, looking at the actual content that's published and what the Plaintiffs say were defamatory and violated the Lanham Act, the 35 statements, really are not commercial advertising or promotional materials. They don't deal with any of Infoblox's products, services, capabilities. They are really all about other parties and individuals.

**THE COURT:** Okay. Is there anything else you wanted to offer on the motion?

**MR. GRYGIEL:** There's just one other point, Your Honor, if I may, coming back to the ""of and concerning"" point, I do think -- and, again, I know this is not binding authority on the Court but I think it is more than instructive -- if the Court looks at the *1st Amendment Praetorian* case, there the plaintiffs were making an argument very similar to what's being advanced by the Plaintiffs here.

Because if I'm understanding their argument correctly in their opposition papers, they are saying that two of the statements associated the Plaintiffs with VexTrio. Therefore, every other reference to VexTrio in all of the other publications, the other 33 statements, necessarily should be understood as accusing the Plaintiffs of the same conduct.

That exact argument was raised in the *1st Praetorian* case where the plaintiffs argued that -- where they were identified as an extremist group in the article, that every subsequent usage of that term by The New York Times necessarily defamed them, and the court rejected that argument in no uncertain terms.

It said (as read:) "Although plaintiff is mentioned in parts of the articles, that does not mean that all of the statements concern plaintiff. This is even true when the plaintiff is described as a part of this larger group or an example of a member of the group."

And that's 2025 Westlaw 949975 at star 13. And the final point I want to make about that case, Your Honor, is that actually provides an a fortiori argument here because New York law is more lenient than California. It does not have the two-part test to satisfy the "of and concerning" requirement at the pleading stage.

It only has the first part, is -- could this possibly reasonably be understood as referring to the plaintiff. And

here, this Southern District of New York held that even under the more lenient standard, the plaintiffs could not get past a Rule 12(b)(6) motion.

So, for the reasons I have articulated to the Court, our position, Judge Pitts, is that the Plaintiffs cannot satisfy the stricter standard that applies under California law.

**THE COURT:** I mean, I guess I am also -- is there a difference in the substantive law of defamation as to California and New York?

**MR. GRYGIEL:** There is. And on the ""of and concerning"" element, Judge Pitts -- that's the point I'm trying to urge on the Court -- that New York law is more lenient.

And here, the Court held -- where the Plaintiff was making a structurally identical argument to that made by the Plaintiffs here, it was still insufficient to satisfy *Iqbal/Twombly*'s requirements with respect to the "of and concerning" element of a defamation claim.

**THE COURT:** Isn't there -- I mean, again, there is sort of two versions -- and I will certainly ask them about this -- I mean, there is one theory that every reference to VexTrio by necessarily implication and in their view actual understanding as a reference to Sky/Tek -- the two companies that I will call Sky/Tek, as I think you do as well in your briefing -- but there is a second -- I mean, some of the

statements do specifically reference Los Pollos or Taco Loco; correct?

**MR. GRYGIEL:** Correct.

**THE COURT:** And so, isn't there -- I mean, that's a different question --

**MR. GRYGIEL:** It is.

**THE COURT:** -- as to attribution; right?

**MR. GRYGIEL:** That's correct, Judge Pitts.

**THE COURT:** Okay.

**MR. GRYGIEL:** And again --

**THE COURT:** And do you -- setting the part about the question whether they have actually pleaded actual -- that it was actually understood by a third party, do you agree that statements about Los Pollos or Taco Loco or Adtrafico are reasonably understood as statements about Skynet -- Sky/Tek?

**MR. GRYGIEL:** I respectfully but emphatically disagree with that proposition, Judge Pitts, and here is why -- yes, and look at paragraph 23 -- the Plaintiff alleges that Skyforge -- not Teknology but Skyforge -- operates the platforms. But that allegation does not transform statements about Los Pollos, Taco Loco or Adtrafico into statements -- a statement about either Plaintiff.

We would have to have here a much -- we have, really based on this pleading, a fairly opaque and murky relationship between the Plaintiffs and the platforms. In their

prelitigation correspondence to us, the Plaintiffs -- and we mentioned this in our briefing -- stated that the platforms are operated by subsidiaries of Skyforge. How far removed from the parent company, we simply do not know here.

But it is clear that -- at least based on the prelitigation correspondence although it is somewhat muddled in the pleading -- that Skyforge is not the direct owner of either; and the correct Plaintiff here has to be the owner of the platforms. He simply can't make references to Los Pollos, Taco Loco and Adtrafico and satisfy the requirement. The law is pretty clear about that.

**THE COURT:** Okay. So, just so I understand, you wouldn't challenge the theory that -- if I were to say to someone, you know, that I have done some research and you should know that installing Excel on your computer will result in the computer turning on a camera and sending live video of you across the internet without saying who created Excel or who the data is going to.

**MR. GRYGIEL:** Perish the thought, Your Honor.

**THE COURT:** You wouldn't contend that that wouldn't be reasonably attributed to Microsoft; right?

**MR. GRYGIEL:** Correct, Your Honor.

**THE COURT:** Okay.

**MR. GRYGIEL:** Correct.

**THE COURT:** That's not the argument --

**MR. GRYGIEL:** That's not the argument here.

**THE COURT:** Okay.

**MR. GRYGIEL:** I mean, part of the issue that we have raised in our papers is that there are all these clandestine relationships between all of these parties. And who is the actual owner of Los Pollos, Taco Loco and Adtrafico is simply nowhere to be gleaned from the complaint.

And for the reason the Plaintiffs have already indicated to us, again, in a letter to us before the case was commenced, that they are run by subsidiaries.

There is a leap there that they are requiring the Court to make that the law does not permit it to make under these circumstances.

**THE COURT:** Okay. Thank you.

**MR. GRYGIEL:** Yeah, thank you, Your Honor.

**THE COURT:** I will hear from the Plaintiffs' Counsel.

(Pause in the proceedings.)

**THE COURT:** Let me start there with you. What is -- I mean, the complaint, as they note, says that the Skyforge operates Los Pollos and Taco Loco. What is the direct relationship between those products and programs and Skyforge or Teknology?

**MR. WIEBER:** Yeah. So, for the record, Sean Wieber on behalf of Plaintiffs or for those listening at home. So, yeah, the actual complaint, I think, quite clearly sets it out as to

the relationship citing --

**THE COURT:** There's something besides paragraph 23?

**MR. WIEBER:** Your Honor, all of section -- in the general allegation Section A but 23, yes, I think for -- to think about just sort of the examples that have come up. I look at it as I have had to learn the case as well. You could equate it to Meta having platforms that people are familiar with, Facebook and Instagram. In this scenario Skyforge is the Meta of the world, and the two platforms that they operate as pled are Los Pollos and Taco Loco.co; and Teknology, the other side, is providing the servers that operate them.

**THE COURT:** I guess the question: Do they -- we say operate -- are they the direct owners?

**MR. WIEBER:** Yes.

**THE COURT:** I mean, it seems like they are -- the representation has been made that the understanding was that they were operated through subsidiaries.

**MR. WIEBER:** No. Skyforge operates and owns the platform.

**THE COURT:** Directly?

**MR. WIEBER:** Directly, yeah. The parties of interest -- the parties of interest for all -- for all the platforms mentioned are through Sky -- through the Plaintiffs and there's --

**THE COURT:** Well, I mean Adtrafico used to be operated

through a subsidiary; correct?

**MR. WIEBER:** Correct, which is now -- it has been subsumed into -- into Skyforge just as the allegation as it relates to BrightCore AG is mentioned as one of the entities and was also merged into Skyforge Digital.

So, the party in interest for the platforms are the two Plaintiffs that you have before, and I'm -- I don't know what reference he is making to this -- as to confusion to prelitigation communications. We have always made it quite clear as they themselves -- importantly, they themselves -- just looking at the presentation materials in their blog post or you can just look at the charts that they have put together, they are the ones drawing lines and circles and red lines and dots putting it all together under their theories.

But, importantly, just to sort of -- I think, Your Honor, just to level set just on one very important part, we didn't want to have to bring a lawsuit to be here to do this, and you can see that is quite clearly set forth in the attachments and in the allegations that olive branches that we have made on behalf of Plaintiffs in light of their -- what I would -- we have called -- and it is well pled -- and these are not my words. It is just an ongoing campaign to destroy the executives, my clients, the founders, the owners and the employees. And I do think it is for sake of profit.

**THE COURT:** Well, they are litigants here; right?

**MR. WIEBER:** Oh, absolutely.

**THE COURT:** The owners of the entities -- the only parts before me are Skyforge Digital and Teknology; correct?

**MR. WIEBER:** Yes, Your Honor.

**THE COURT:** So, the question on -- the statements about the owners, I mean, presumably if they think they have been defamed, they can bring their own claims.

**MR. WIEBER:** Totally understood. But Infoblox, as Your Honor had mentioned, I mean, they are for profit. Their corporate disclosures demonstrate that they are private equity backed, but my clients, those Plaintiffs, are here because they are suffering harm.

And we have done this in sort of two ways. One is, of course, we have indicated that there is millions of dollars in ongoing damages that are accruing because of the ongoing false and defamatory statements and more have been made since the filing. There has been new postings and new YouTube hits and things of this nature that have gone out.

As it relates to -- there is another just aspect here that is different than a lot of civil matters. I mean, words really matter. And it is important to note that it is not hyperbole. We put in paragraph 112 of the complaint -- I mean, there is a serious ongoing threat where an individual that is an owner of our company's life is endangered because of this very callous and false misrepresentations of criminal misconduct and fraud

as being part of a Russian cyber criminal organization.

And in today's world where, you know, bullets are flying in Ukraine and Russia's war against them, where we have indicated that someone that has contributed militarily, technology wise and financially wise, it's -- it is --

**THE COURT:** I mean --

**MR. WIEBER:** -- it sets it apart from a damages perspective and it is just important to have --

**THE COURT:** I mean, I understand that. And part of what -- I will be very frank. I mean, I can sense the parties strong emotions on both sides in the briefing in this case.

The issue before me is the sufficiency of the complaint under Rule 12(b)(6) and not the -- you know, and ultimately what's most useful to me in thinking about the sufficiency of a complaint under 12(b)(6) is, you know, whether it is or is not. I'm going to be thinking of it from my objective view applying the law as it stands. So, I think that's the focus of what we should be talking about today.

**MR. WIEBER:** Understood. Thank you, Your Honor.

So, then just focusing there, you have mentioned the standards with Counsel a couple of times. It is worth just sort of level setting that.

So, we look at the Ninth Circuit case law, the *Austin* case -- or there are several others that I'm sure Your Honor is familiar with applying -- it is clear that all factual

allegations are accepted as true at this point at this stage and all reasonable inferences must be drawn.

**THE COURT:** Right. I'm well aware of 12(b)(6). I think the issue is why -- you know, let's start where we started the other issue. Why isn't it the case that Ninth Circuit authority requires you to have -- and maybe it is a formality -- but at least to have said, you know, these statements -- the statements were challenging were understood -- actually understood, either at the time they were made or, you know, when they were received by an audience as references to Sky/Tek?

**MR. WIEBER:** Understood. So, that's -- so, I think we have -- I think we have addressed it, but I will --

**THE COURT:** Well --

**MR. WIEBER:** The ""of and concerning"" nature, you are talking about?

**THE COURT:** Yeah, because your only allegations involve -- the specific allegations involve conduct -- a timeframe before the statements you are actually challenging and identified; correct?

**MR. WIEBER:** Well --

**THE COURT:** Separate and apart from your interference of contract.

**MR. WIEBER:** So, just on that point, that is sort of -- that's not permeated. That's actually not true.

Actually, on the chronology and I will get it -- we have pled and it is in late -- so, November 2022 is when VexTrio Viper comes into existence. It is talked about in May of 2024 by Defendant Burton at cyber security conferences under which they are promoting the Infoblox products.

In late 2024, Your Honor, as we have pled, Defendant Burton starts posting a series of posts on forums in social media identifying that Plaintiffs -- talking about the organized criminal syndicate and they -- this bragging. And it is in there, you can see, she has identified an entity called Qurium, Q-U-R-I-U-M, which self identifies as a Swedish cyber security foundation in which one of their goals -- purported goals is to disrupt VexTrio. And that is in the complaint, and we have her entire -- I think it is a LinkedIn post and --

**THE COURT:** The issue here, as they have pointed out, is that -- I mean, the heading of the complaint, the first defamatory blog post is June 12th, 2025; correct?

**MR. WIEBER:** As to the blog post, correct, but not the first defamatory statement. But, yes, defamatory statements are occurring in 2024 at least as the impacts that we are talking about, the ""of and concerning"." So, setting aside -- setting -- so, just looking --

**THE COURT:** You are not suing -- you are not challenging on behalf of any of those statements; right? The first statement that you are bringing that you have

specifically alleged as defamatory in this complaint, I think, is the June 2025 statement; correct?

**MR. WIEBER:** Yes, June 12, 2025, correct. But it provides context which goes into some of the case law, Your Honor, that we have cited on this issue as it relates to -- just Counsel had mentioned *Dickinson v. Cosby* case and talked about some of the facts of that case. That case does demonstrate that you have got to look at the totality of the circumstances.

**THE COURT:** Well, I guess the question is -- and, again, going back to the issue -- that may all be highly relevant to what they characterize as the first issue is, you know, is it plausible that a reasonable recipient would understand this.

You know, why are they wrong in suggesting that for each of these statements at the very least you have to say and these people received it and actually understood it in this fashion, why -- which I don't think is included. I mean, that's their point is that there is not -- except as to the 24 -- the -- what happened in 2024, that is the basis for your interference with contract claim, we don't have a simple statement: People received this and actually understood it in this manner.

**MR. WIEBER:** Correct. So, some that they have conceded that do mention -- based on the colloquy you had with Counsel, some are mentioning Taco Loco.com, Adtrafico,

Teknology specifically. But then for the ones that are a little more --

**THE COURT:** There is a separate issue; right. There are a few that specifically say Sky/Tek. And so, we don't have the issue there.

**MR. WIEBER:** Got it.

**THE COURT:** Let's say for the ones that don't -- including the ones, perhaps, that just reference Los Pollos -- I'm not sure -- even then, you might need to say, and this -- an actual person understood this as a reference to Sky/Tek.

**MR. WIEBER:** And so, I think we have addressed that in two ways. So, one is just looking at sort of the case that we put, so, under California law -- I'll just give you the case -- the *Church of Scientology* case. That is a Ninth Circuit case from 1984 applying California law.

But there, the Ninth Circuit talks about there doesn't need to be a specific requirement that the -- to the entity being defamed actually be mentioned specifically by name. It is sufficient if the jury could infer that the defamatory statement by context applies to those plaintiffs and --

**THE COURT:** Right. But, again, the issue -- they are saying *AT&T* establishes this rule requiring as a pleading matter that you plead an -- it was actually so understood. And you haven't done that here.

**MR. WIEBER:** I believe we have, Your Honor. So, in

looking at -- I will give you -- so, looking at 153, 154 when we talk about the Hetzner [sic] -- the Hessner [sic] entity, which is the web hosting company based in Germany, that terminated the contract -- the contract --

**THE COURT:** Right.

**MR. WIEBER:** -- after -- after they have gone out and evangelized and bragged about the industry collaborators that they are working with.

**THE COURT:** Right.

**MR. WIEBER:** And they have conducted --

**THE COURT:** Again, this all happens six months before the first defamatory statement that you are challenging on --

(Simultaneous crosstalk.)

**MR. WIEBER:** First -- not first --

**THE COURT:** That you are bringing positive action --

(Simultaneous crosstalk.)

**MR. WIEBER:** Correct, but not the first defamatory actions that are out there. I think if we get discovery into what the communications were in the -- late 2024, there is clearly going to be communications that could be added to those. We -- we are only living within the record that was actually -- that we can pull, right, which are those written words. That's why --

(Simultaneous crosstalk.)

**THE COURT:** The issue they are pointing out -- and,

again, maybe they are misreading the *AT&T* case -- and you can tell me that they are misreading the *AT&T* case -- but in a defamation cause of action, you may have adequately pleaded that whatever was said to Hetzner in 2024 was both reasonably understood and actually understood as being about Sky/Tek.

But it also needs to be the case that whatever was said in June 2025, that you are now bringing a lawsuit on the basis of, was reasonably understood and actually understood as being about Sky/Tek for each of the statements.

**MR. WIEBER:** Right.

**THE COURT:** And, I mean, I think that's what the point is -- their argument is *AT&T* requires that to be pleaded in the complaint, and they say you haven't done so. So, where is -- there something that I'm missing?

**MR. WIEBER:** Yes. So, I will adopt the *Twombly/Iqbal*. I do think that you can get -- you get the -- you get the -- Plaintiffs get the benefit of the inferences. But just looking at the *Dickinson* case, I think that case does stand for that you can infer that evidence that third parties understood the statements to be of and concerning a plaintiff and it can be indirect. It can be indirect. And we talk about this indirect nature as to 153 and 154 in the complaint.

From our perspective when UBS and Credit Suisse -- I mean, major financial institutions -- Corn'er Banco, all within a few day period after the public posting of the industry hubs, after

the cancellation of the Hetzner, that it can reasonably be inferred that those statements that were out there occurring were actually being understood to be truthful about Sky/Tek and Teknology; thus, cancelling the contracts to them.

I mean, these financial institutions are not just going to sort of willy-nilly just say, Oh, I got a random letter and just start cancelling banking relationships and de-banking.

I mean, clearly there were communications that unfortunately at this point in time we don't have access to. When we get to discovery, we are clearly going to seek those communications.

I do think the *Dickinson* case quite comfortably allows this Court for present purposes on a 12(b)(6), under the legal standards that apply for evaluating whether or not we have met the pleading standards at this early stage can be indirect. I think we have pled the indirectness.

If Your Honor wouldn't mind, if you're okay on one aspect, I would like to talk a little bit about the commercial speech aspect, if that's okay. The -- clearly, Plaintiffs believe that the challenged statements are commercial speech. We believe we have met those elements.

The *Xu* case was mentioned, the *Xu v. Huang*, the California law case. There, I think it is very, very important to just have a fundamental understanding that their argument appears to be -- they didn't bring it in their opening brief. It is only

in the reply -- and the concept of whether or not the Anti-SLAPP applies is a paragraph or a paragraph and one sentence on whether or not there is a fundamental rule that this Court must apply or there is some case that this Court must apply that -- for the commercial speech exemption to apply, it must be a competitor -- speech about a competitor.

And, as I was thinking about that today -- Your Honor had picked up on one aspect that was on my mind -- just sort of looking at can you point to anywhere in the actual statute -- the actual California Anti-SLAPP statute that uses the word -- that has an element or something of that nature that says it must be limited to that of a competitor. That answer is no. I would earn courage this Court not to infuse that with an element of requiring that your speech be about a competitor.

I was also thinking much more simply, like, in a world in which -- I think their position on the Defense side would be that the Court could apply this Anti-SLAPP exemption if it is Coke versus Pepsi or Burger King versus McDonald's, clear competitors.

But the policy behind that under the California law -- I mean, I was just thinking, like if Pepto-Bismol did something and said some statements about, you know, going to eat at McDonald's or Burger King and we have got the cure that ails you, that's clearly -- that's clearly commercial speech.

And I don't see any reason under the law or policy that we

should give a carve-out just because they are making statements and I'm not in direct competition with them. And just on the case, Your Honor --

**THE COURT:** Let me say, I think the theory -- I mean, there is a basis, which is that the statement at issue has to be -- the cause of action has to arise from a statement or conduct by the Defendant consisting of representations of fact about the Defendant's or a business competitor's business operations, goods or services. I mean, that's subsection 2 of California Code --

(Simultaneous crosstalk.)

**MR. WIEBER:** Right.

**THE COURT:** That seems to be the language from which they are drawing the theory, and I think the theory is essentially, you know, if I'm bringing -- and I think the concern here is in some ways, he obviously -- the driving concern that I think drove the California legislature here is, you know, I bring a false representation cause of action against a business, standard California false representation claim; and suddenly there is an Anti-SLAPP statute filed. The entity is saying it was engaged in protected activity. You know, that's the classic thing that they didn't want to be applying to.

This is a little different case arguably, and that might be why there is a question of whether, you know, the statements

here that are challenged are a representation about Sky/Tek's business operations, goods or services. And this seems to say that you have to be a business competitor in some sense.

**MR. WIEBER:** And I just -- I understand where that can be -- I won't quibble with -- reasoned minds can presuppose that and I totally get it. I would just indicate that in this stage, I think, we should just use the plain language. We can look at it. I don't think it applies but --

(Simultaneous crosstalk.)

**THE COURT:** I'm sorry, I misspoke. I'm actually quoting not from the language itself but from *Simpson Strong-Tie versus Gore*, which is the California Supreme Court whose interpretation of California law binds me today.

**MR. WIEBER:** Correct. Understood. Maybe then to just -- you had raised -- pardon me. My colleague had talked about whether the -- where are they -- they are not talking where each challenged statement is false. And I'm happy to -- for ease of just understanding -- first of all, they are not saying that across the board. I mean, they are sort of artful in some of the points they have picked about certain statements are clearly defamatory and don't sort of make enough public interest. I mean, accusing people of criminal conduct just --

**THE COURT:** I mean, I just -- I think it's important and I think -- certainly to have a strong basis for arguing that given the First Amendment, that there is an obligation to

identify the specific false nature of each of the statements that you are challenging and that you are required to do so.

**MR. WIEBER:** And -- understood, and I think we have. And I'm happy to -- I'm happy to read -- for ease of convenience, we took the 35 and just put them into, what I will call, six categories or six buckets just for ease; but I can very briefly -- I have put them all in a chart that established specifically -- like, I just -- just by way of example, like, the first, the statements falsely alleging that Sky/Tek are affiliated with or owned by VexTrio.

**THE COURT:** So, which are those statements?

**MR. WIEBER:** That's the first bucket. So, in the -- in the complaint, as it relates to the falsity aspects, I would direct the Court's attention to paragraph 3, 22, 23, 26 --

**THE COURT:** Well, I think --

**MR. WIEBER:** -- 35 --

**THE COURT:** -- I think the actual statements start at 87; right? I mean, which language in the blog post, in the Black Hat presentation -- the other blog post -- makes that representation? Because that's what you are here on.

**MR. WIEBER:** Sorry, I was giving you -- I was giving you the, where have we alleged that the statements they have made are false. But --

**THE COURT:** Okay, and --

(Simultaneous crosstalk.)

**MR. WIEBER:** But the actual false statements that they have made?

**THE COURT:** Yes.

**MR. WIEBER:** Yes. So, just -- the easiest way for me to do it would be by just citing our opposition, so, as it relates -- so, what they have said us not or being affiliated with VexTrio, we set that forth at the opposition at pages 10 and 11, also page 11 for the second category of harboring or knowingly providing infrastructure to threat actors.

And these are all --

**THE COURT:** Here is the issue, that they -- you know, I don't think you have a blog post where it specifically says "Sky/Tek harbors or knowingly provides supports to" -- these are characterizations of the way you view what they have said. And so, the question is which specific -- you know, what is the paragraph that makes that representation?

**MR. WIEBER:** So, again, I would just sort of -- I wish I could just, like, at the top of my mind walk through it. I would just encourage the Court to just holistically review the --

**THE COURT:** Well, I think the point is it is not a holistic review. I think it has to be --

(Simultaneous crosstalk.)

**MR. WIEBER:** Oh, no. It's in there. This is not a dispute, just being gleaned from osmosis. I think those are in

there, and I would also look -- you can actually look at the exhibits which are incorporated.

**THE COURT:** I mean, I think their point -- which I have some sympathy with because it will -- it may be up to me -- is that right now the complaint is organized -- you know, their complaint, you know, whether it is a 12(b)(6) issue, a Rule 8 issue, something like that -- is to say: Here are some statements. They were false. But to not say, you know, that it was false to the extent it made misrepresentations about Sky/Tek. It was false to the extent it made this. And, I mean, some of these are long statements.

**MR. WIEBER:** In -- I understand. Respectfully, I don't think that's what is required, the redundancy of going through and taking what is already, I think, a well-crafted 40-page complaint and turning it into 3X that by having to remake those same statements. I just go back to --

**THE COURT:** So, I mean, the problem -- the problem I'm having -- I'm looking at paragraph 88-1, which is sort of one of the statements seems to be offered here is purportedly involving the -- defaming Sky/Tek while marketing, promoting Infoblox's own products.

You know, that's simply describing their own work. I don't actually see any reference whatsoever to Sky/Tek in that paragraph.

**MR. WIEBER:** Well, so, again, it is just sort of

the -- they are the ones who have coined the phrase VexTrio.

**THE COURT:** They don't say VexTrio even in that paragraph. They are literally -- is there an allegation that the description in 88-1 about what they do is false?

**MR. WIEBER:** So, the answer is I can't put my finger on it but that's not because it doesn't exist. What I'm encouraging is just asking is it stating -- the question is -- the nature that I think they should be asking -- does it state enough facts that it is plausible on its face for these claims?

That is -- that is -- that is the standard. And I think when we look at the allegations that precede the actual excerpt statements of falsity, there is a clear understanding of who it is they are talking to, who it is they are making reference to. And it is all related to my clients.

I don't think we should be held to a standard of having to map out every one of those and then tie it back to their interpretation of their own statements and then pulling their own quotes and just citing it ad infinitum.

**THE COURT:** Arguably, they would say that's what the First Amendment does require because we are targeting speech here and whether it is commercial speech or otherwise, that's -- I mean, I don't think there is an argument it is commercial speech for First Amendment purposes. It is only an issue on the Anti-SLAPP law.

Let me ask you a different question: Is it your view that

every reference to VexTrio in all of these materials is defamatory of your client or is it only those instances in which there is a -- also a reference to either one of the two companies who are before me or one of the platforms that they operate?

**MR. WIEBER:** Honestly, I'm not sure you can decouple those, how they have coined it. I do believe that if you look at how they have identified VexTrio, they have identified it as being run and operated by -- saying it is synonymous as Los Pollos. It is synonymous as Taco Loco.

**THE COURT:** Well, no, they don't. I mean, by your own allegations, they say it's -- you know, I think there are hundreds -- there are many entities that make up this thing, and they identify these as some of them. They also say the dividing line is hard to ascertain so --

**MR. WIEBER:** Right. Every entity on that chart is not an entity related to my clients. So, I can firmly tell you that. But the narrative that comes out as to who is VexTrio, who are the criminals, who are running it, who are conning people, who are the Russian cyber criminals, that's clear as day that they are indicating that those are Sky/Tek and the individuals running it that are employees or owners.

That's -- that is -- I think that becomes crystal when you look at -- when you take the totality of the posts, which are dense, but then you look at how they are coining it and

phrasing it and how they are making reference to it; but, I mean, some of these -- an image is worth probably my words on this. Looking at some of the PowerPoints that are in exhibit -- like the Black Hat presentation, I mean, they are literally putting my client's representative face on it and saying some really nasty things and saying this is VexTrio. This is -- this is VexTrio. This is who it is, if you want to see what they look like, if you want to see what kind of cars they drive, if you want to see what they are eating.

Like, Exhibit 3, Your Honor, I mean, some of these -- I mean, some of these -- and I know it is hard to build a record -- the PowerPoint is not paginated; but you can see the -- like the image of the gentleman flying the middle finger here and they put the name Julio. Julio is a reference -- and this is in the -- Julio is the CEO of Sky/Tek.

**THE COURT:** Right, but he doesn't have a case here; correct?

**MR. WIEBER:** No. Understood. But the case law is also clear, Your Honor, that statements about -- and I will just -- I will just give it to you -- statements about corporate officers. So, it is the *Palm Springs Tennis Club* case, California 1999, corporate -- stands for the proposition that corporations against the same defamation claims when the defamatory statements are about corporate officers related to the corporation's business.

And so, while they might not have brought claims and individuals in Switzerland have not brought claims doesn't mean they can't bring claims. They haven't to this date, but I don't think it's --

**THE COURT:** So --

**MR. WIEBER:** I don't think it's --

**THE COURT:** -- Tesla has a cause of action against anyone for stating purportedly defamatory statements about Elon Musk, is that your view of the California law?

**MR. WIEBER:** I think -- there's a lot of views about Elon Musk. As far as -- I think it is not just in general. You would have to pinpoint down to what it is, what are the allegations.

I can say this confidently: For the allegations that we have put in the complaint as relates to the fact of criminal misconduct and fraud, those aspects that are being directed at specific individuals by name, yes, those executives can be defamed. They don't need to bring their own claim. And, yes, there can be scenarios where statements about -- you would have to look at the particular claims at issue and you have to identify the particular statements -- but if they are defamatory, absolutely. Absolutely, I think Mr. -- I think Elon Musk could have a cause of action --

**THE COURT:** Let me ask you -- I mean, again, I'm still -- you can probably hear, there is a little frustration.

I'm looking, for example, at one of the challenged statements, as I understand it, is paragraph 100, subsection -- maybe 3, actually 3, which is that these apps can be tied to the VexTrio enterprise in multiple ways such as through developer information which often lists one of the shell companies and through DNS records.

Figure 3 shows that the IP address provided was used simultaneously to host HolaCOde, AdsPro Digital, Los Pollos and multiple scam apps.

I mean, is there an allegation that the statement about the IP address was false?

**MR. WIEBER:** Pardon me, Your Honor, I was trying to flip there. You were referencing what paragraph?

**THE COURT:** Subparagraph 3 of paragraph 100.

**MR. WIEBER:** Oh.

(Pause in proceedings.)

**MR. WIEBER:** No. And I don't -- I hear what you are saying. Like, Counsel, can you point to specific -- put out the allegation. Can you point to the specific thing where you are saying that particular aspect is false. I would --

**THE COURT:** Right. I mean, if you prefaced it by saying "contain the following false and defamatory statements" and then --

**MR. WIEBER:** Right.

**THE COURT:** -- list subparagraphs, but now you are

telling me this is not actually false.

**MR. WIEBER:** No. It is false. And what I'm respectfully suggesting is --

**THE COURT:** What is false about it?

**MR. WIEBER:** The whole -- the entire -- let me -- the section 100; right?

**THE COURT:** Paragraph 100, subparagraph 3, which is identified here as one of the false and defamatory statements in the August 12th, 2025 blog post.

**MR. WIEBER:** Right. And I get there -- so, for the 100 subset -- little I, little 2, the little 3, the little 4 -- all in paragraph 100, I get there by referencing collectively paragraphs 3, 22, 23, 26, 35, 36, 37, 91.

**THE COURT:** Just tell me. I don't need the paragraphs. Just what is false about this statement?

**MR. WIEBER:** Oh, that VexTrio benefits when the -- it is as fundamentally false as saying Los Pollos, Adtrafico, and Taco Loco, anything they are doing is somehow benefiting like --

**THE COURT:** No. I'm reading paragraph 100, subparagraph 3, which starts "these apps can be tied to the VexTrio enterprise in multiple ways," and then it has a figure showing an IP address used by scam apps as well as Los Pollos.

**MR. WIEBER:** It is fundamentally false because AdsPro, Los Pollos have nothing to do with VexTrio. The premise is

completely false.

**THE COURT:** Well --

**MR. WIEBER:** These apps can be tied to the VexTrio enterprise when we have already clearly said that we are not part of -- we are not part of VexTrio.

**THE COURT:** Is it false -- are you alleging it is false that the IP address 136.243.216.249 was used simultaneously to host these as well as multiple scam apps?

**MR. WIEBER:** Your Honor, with all --

**THE COURT:** I mean, here, they are explaining, as I understand it, purporting to explain the evidence from which they are drawing their conclusion that they have drawn about this thing. And so --

**MR. WIEBER:** If I --

**THE COURT:** -- and they are saying this is how we are tying it ourselves. Now you can say at the end of the day that's wrong, but I'm not sure that -- unless there is something here that is affirmatively false -- that's specifically false -- and I'm not seeing -- you are not explaining to me specifically in this statement what is false. I understand you don't like the implication, but that's, I don't think, the standard for defamation cause of action.

**MR. WIEBER:** So, I have not tied out as to what -- and I'm not sure anybody has -- as to what IP address 136, whatever --

**THE COURT:** It seems to me to make this statement actionable, you would have to say either that that was false; that it wasn't, in fact, that these were shared or that it was false that the sharing of an IP address might be one form of evidence that would connect certain entities to other entities.

**MR. WIEBER:** But, Your Honor, so, on this -- again, you are saying: Counsel, drill down on that particular -- this is all part of a -- it is all part of a sentence within a paragraph that is fundamentally false.

**THE COURT:** But, you know, you have broken it out as four specific false and defamatory statements in the complaint. You have specifically broken it out to say these are subparagraphs, the following --

**MR. WIEBER:** Correct, like subparagraph I, right, at 100 also stating in the same paragraph where they say VexTrio benefits and --

**THE COURT:** Right. But, again, you have told me -- at least the way it's structured suggests subparagraph 1 is a false and defamatory statement separate and apart from subsection 2 being a false and defamatory --

**MR. WIEBER:** Correct, it is.

**THE COURT:** -- statement and 3 is as well.

**MR. WIEBER:** It is. Correct. I understand.

**THE COURT:** And so, what is -- again, what is the falsity? Is it false that looking to DNS records --

**MR. WIEBER:** It's --

**THE COURT:** -- is a potential way to tie entities to one another or is it false --

**MR. WIEBER:** It is --

**THE COURT:** That the IP address was not being used by those?

**MR. WIEBER:** It's false that VexTrio benefits when smart links from Los Pollos and Adtrafico and Taco Loco are serving the verticals. It's false when --

**THE COURT:** Where is that in paragraph subparagraph 3?

**MR. WIEBER:** So, again, I can't -- clearly the complaint at that point is not set up and put it there and then put the references; but I just --

**THE COURT:** The language you were just reading to me was not in subparagraph 3; correct?

**MR. WIEBER:** Yes -- subparagraph 3?

**THE COURT:** Paragraph 100, subparagraph 3.

**MR. WIEBER:** Yeah, these apps can be tied to the VexTrio enterprise.

**THE COURT:** You used the word "benefit."

**MR. WIEBER:** Sorry. I was just two up -- two above you on little I.

**THE COURT:** Okay, but we are talking about 3 right now.

**MR. WIEBER:** Yeah. The apps can be tied to the

VexTrio enterprise --

**THE COURT:** So, is it false that shared IP addresses through DNS records may be one evidence of connection to an enterprise?

**MR. WIEBER:** I don't know what it is that they are saying other than I can tell you that it is absolutely false that my clients are any part of this VexTrio enterprise, full stop. So, when they go on to say about a random IP address being used to host AdsPro and Los Pollos as scam apps is false and defamatory.

**THE COURT:** Well, they say was used to post those and multiple scam apps. So, the allegation is that this IP address was shared between those --

**MR. WIEBER:** And again so --

**THE COURT:** And you are not saying that they were lying about that; correct?

**MR. WIEBER:** Standing here right now, I have no idea if they were lying about that particular IP address; but I respectfully suggest that the arguments that we were making as it relates to the false statements are not drilled down within clauses within -- within clauses of their paragraphs and within sentences within those paragraphs.

I think the law is clear that if you can look at -- what would a reasonable listener understand to mean when that is read -- in context -- in the context that becomes clear as day

is that if I left whether I'm reading the blog post or attending the hearings or attending the presentations, my big take away is to go talk to Infoblox; if I have something that I'm concerned about it as it relates to VexTrio, I had better buy their products because the participants in VexTrio are criminal; they are Russian; they are cyber criminals and they are really bad, and they should be in jail and they are going to steal your money.

That core nexus permeates the entire publication of these false statements. And I'm again suggesting that we cannot wipe that context away when the Court is parsing through whether or not we have met our 12(b) standards to put them on notice.

**THE COURT:** Well, it seems to me that the challenge here has to be -- I mean, this is -- the First Amendment applies. We are talking about defamation.

And so, the question is are the specific -- you know, your view may be that that is false. Are the specific -- is the specific evidence from which they drew their conclusion, is that false? Were they not truthful about that evidence? You know, were they misunderstanding that evidence?

And that's where there is a bit of a mismatch here in the sense that, you know, the allegations in the complaints are that Skyforge and Teknology are upright companies and operated by upright individuals. It is possible that for whatever reason Los Pollos or Taco Loco or these other things ended up

being used, and that Skyforge, you know, says it has tools in place to try to stop that from happening. It is an upstanding company. That doesn't mean it couldn't have happened and that they may have drawn the conclusion.

I mean, so the question is at what point are we crossing -- you know, where is the -- that's why I think it is important; that there be specific explanations on a statement-by-statement basis as to why particular statements are false.

**MR. WIEBER:** Right, and I understand that. I don't believe that that is the standard that has to be pled. I know of no rule that says that it must be in a specific paragraph, and you cannot incorporate by reference and you cannot make a prior reference to the -- the aspect --

**THE COURT:** I think the challenge is that -- the challenge is that there are specific characterizations about specific evidence that are the basis for the allegations they are making here. And to say they are all false because we are generally an upstanding company is not enough and it --

**MR. WIEBER:** But that's also not a fair characterization, I think, Your Honor, as it relates to how it is we have set forth -- I think in a lot of detail prior to the actual defamatory statements being called out -- setting forth in very -- in very clear aspects why it is that the statements that you are about to read as you turn the page are

fundamentally false and defamatory and damaging.

I think the way that we have done it passes muster. I think they know what it is -- they clearly understand. There's no confusion on the Defense side as to what are we defending against. They have known. They have known for a long time.

And I'm happy to -- by the way, Your Honor, the six buckets that we have -- I understand it is probably annoying on the record for me to -- but I can tell you -- I have in a chart the seven or eight paragraphs that support the allegations by the groupings, and I can just read them. I can read it in for the record.

**THE COURT:** I think you put it in your opposition, so I think we have a way to --

**MR. WIEBER:** Yeah.

**THE COURT:** Let me ask you, why is it not the case that at least as currently stated, the failure to plead anything about the terms of your contracts with the companies that are the basis for your intentional interference with contract claim precludes -- you know, makes it an inadequate pleading at this point?

**MR. WIEBER:** Yeah, I don't --

**THE COURT:** I mean, I think -- it's your contract. It is in your possession. Generally courts say if you are going to plead intentional interference with contract, you have to provide some details about the contract. The general sense of

a contractual relationship is not enough. We need to know what specific contract was interfered with.

That puts the Defendant on notice of potential damages. It gives them an opportunity to figure out what defenses they may have and may be to say, Oh, we didn't do anything with that contract. Maybe we talked with them, but someone else was the one who was a part of that. We don't have that right now. We just have that there was some relationship; contract?

**MR. WIEBER:** Do we have the actual contracts in the record? The answer to that question is no. I don't think that's what is required under the law.

I think we are allowed to identify the specific contractual relationships that Defendants have tortiously interfered with, which we have.

We have identified the business partners and the banks that terminated the relationship with Plaintiffs because of Defendants' tortious conduct, and those are identified with particularity.

And then we also identified the business relationships that Defendants contacted the domain registrars, the hosting companies, the DNS security providers that they were able to persuade, I guess, third parties to cancel relationships with us, and the Hetzner one is identified in particularity; but I don't think it's required to see the actual contract to be able to state -- to be able to state --

**THE COURT:** Yeah.

**MR. WIEBER:** -- a claim.

**THE COURT:** I mean, I think saying simply "I had a contract with X," you know, at least borders on conclusory pleading of the elements. Maybe you don't have to say -- usually, you would say "I had a contract with X. My reasonable expectations of profits from that contact were Y. This is what they did. As a result, I lost this contract and it cost me this amount of damages." I mean, that would be --

**MR. WIEBER:** I think that's a damages analysis, though, not to belabor -- if we look at the Ninth Circuit case law, what is required at this stage, we can draw reasonable inferences that when UBS, an international known high standard banking conglomerate cancels and de-banks a client, that there is a contract at issue and that we don't have access to banking. I think that's what is required at the pleading stages. And that we can make -- does it state enough facts to have a plausible on its face claim that their tortious conduct led to that is a different question of, Hey, what did you have to do on any sort of refinancing? Hey, how much access did you lose? How much -- were there any outstanding loans? I don't think that that's required at this stage to get into sort of those level of granular details.

**THE COURT:** What is the damage you have alleged from the termination of the bank relationships?

**MR. WIEBER:** The termination of the banking relationships is the damages. You mean, the actual financial aspects?

**THE COURT:** Yeah.

**MR. WIEBER:** I don't have -- we haven't quantified that yet.

**THE COURT:** Isn't damages an element of a contract breach cause of action?

**MR. WIEBER:** You are talking about in a contract breach or for tortious interference --

**THE COURT:** Tortious interference. You don't have to suffer damages --

**MR. WIEBER:** We have --

**THE COURT:** -- for a tortious interference claim?

**MR. WIEBER:** Yes, we have suffered damage. But I don't believe I have to pinpoint for -- say, how much, sir -- how much did your clients lose --

**THE COURT:** No. But you have to plead that you suffered damage, right, because it is an element.

**MR. WIEBER:** Yes, and I think we have.

**THE COURT:** And that damage is simply the loss of the relationship with these particular banks and perhaps the need to pursue other banking relationship?

**MR. WIEBER:** At a minimum, yeah, at a minimum. I'm sure when we get into -- when we get into discovery, there are

certain aspects and we dig deeper into those, the actual particular levels of damages will come out. I don't think on the pleading stages we -- I mean, we have indicated that we have -- the cancel contracts, that others have stopped purchasing their services, it all goes to our damages claim. I don't think we have to sort of parse it out at this stage.

**THE COURT:** I mean, I do think you have to say that others -- if you don't identify the others, I don't know that you can bring an intentional interference -- you have adequately pleaded an interference with those contractual relationships. I do think at the very least notice pleading requires that you say these are the contractual relationship we had with specific parties and these are the ones we think you interfered with.

**MR. WIEBER:** Yes, unfortunately, there might be more. I'm totally comfortable at this stage standing before Your Honor on the pleading that you have before you where we have identified the four. We have identified the can -- we have identified those in the complaint with particularity Hetzner, H-E-T-Z-N-E-R, the Germany company that terminated our contract, Corner Bank, Credit Suisse, UBS, all have been identified with particularity. Those are the contracts that have been pled to this point.

Those are the -- and the question of have we done enough to be able to go to the next stage and to get discovery into

that to figure out the communications, who was involved, what industry hubs, what collaborators, what led to those? The answer is yes. We would like to get there. We need this -- we need -- we need the Court to allow us to get into that position because clearly we are not able to -- right now we are not able to get into discovery. We have tried but we just haven't been able to.

**THE COURT:** So, let me -- one thing I just wanted to -- based on what we were talking about earlier is -- so, given that Skyforge and Teknology are the direct owners and operators of Los Pollos and Taco Loco, any -- to the extent it satisfies the relevance standard -- you know, the operation of those systems and whatnot will be a proper subject of discovery and there won't be any barrier to pursuing discovery since they can pursue that discovery directly through your client; is that correct?

**MR. WIEBER:** Correct. Just one clarification -- I'm not try to go mince words. I just want to make sure that I haven't missed -- so, Taco Loco, Los Pollos are in this -- pardon me -- are in this Skyforge branch.

**THE COURT:** Okay.

**MR. WIEBER:** Teknology is on the server side. So, they are not the owners of the platforms. But your question of if we get into discovery and they want to -- if they seek discovery, do they have the right parties to sort of figure out

the nuance as to ownership or what those platforms mean?

**THE COURT:** Well, and what those platforms do.

**MR. WIEBER:** Oh, for sure.

**THE COURT:** Presumably there is not -- the apps, there is no other party --

**MR. WIEBER:** No.

**THE COURT:** -- who would be a party here for them to say, okay, what is Los Pollos actually --

**MR. WIEBER:** No. There is no gamesmanship at all. There is no shell game on this. Like, let's bring it under these two but there is this other Switzerland company that we are not going to put out there. No.

If discovery were to come back, we have the parties of interest that have access to the data that would go to any -- I guess any defenses or anything else that would appropriately be requested and allowed for discovery. Yes, we have access to those --

**THE COURT:** Okay.

**MR. WIEBER:** -- documents and records.

**THE COURT:** I do want to -- we have been going a while. I know my court reporter has been going quite a while and taking a lot.

So, before I close, let me just -- I don't think -- I mean, I think the briefing is sufficient on the other issues for me. Is there any other things that you would like to

address before we give your colleague a few minutes?

**MR. WIEBER:** No. So, I will -- just, as a dismount, just to be brief, we -- we do think -- on behalf of Plaintiffs, we are imploring for the Court's help. We cannot solve this ourselves. We need to get -- we need to get out of the pleading stages. We need to get into discovery, and I don't have another way -- my clients are not here. They are overseas. They are entrusting me through this process and this whole judicial system through the process to do what they have not been able to do absent the legal process, which is to try to get these materials down as soon as possible and to get recompensed for how they have been damaged, which is not small.

And I just -- I know we hear a lot of commercial disputes in our day-to-day -- and you were a practitioner yourself -- there are feelings behind this and there are humans, and it is very, very, very, very dangerous and inappropriate to just whole cloth lump whole organizations as being part of some criminal enterprise.

I mean, it is -- it is dangerous and it is damaging, and it is very important that we move forward because we have not been able to self execute through any olive branch other than bringing this case.

And so, with that, I just -- I just want you to know because they are not here, there are humans that have been hurt through this process that we need to -- we need to get

resolution and we need to get to a jury; and we need to get a verdict and then we have got to go in enforce. And this is a major step and we are at an impasse at this point in time because they won't -- as you saw from the other papers, I can't get them to participate in discovery absent a court order.

**THE COURT:** Thank you.

**MR. WIEBER:** Thank you, Your Honor.

**THE COURT:** I will give you five minutes if anything else you would like to address.

**MR. GRYGIEL:** Just one moment, Your Honor, I had something on my screen that I lost.

I only have two brief points, Judge Pitts, and I really thank the Court and staff for the time you have given us today.

Clearly both parties think this is a really important case because of the First Amendment dimensions that are directly involved.

On the Anti-SLAPP law's applicability, you asked me previously for the statutory language that's relied on to limit the commercial speech exemption to business competitors. And it's 426.17(c)(1). And that language is clear as day.

It says: The statement or conduct consists of representations of fact about that person's or a business competitor's business operations, goods or services.

So, we simply do not have that element satisfied here; and that's why I think this case is governed by Judge Seeborg's

holding in the *Motekaitis* case.

On the platform issue -- I just want to return very briefly to this -- I understood Plaintiffs' Counsel to say that Skyforge owns and operates directly the platforms. That's not what is pleaded or at least it is not clearly.

The reference -- the only paragraph that goes to that is paragraph 23, and I want to -- I do want to point out to Your Honor that in correspondence sent prior to the litigation, Exhibit 7 to the complaint, court Bates stamping 7 of 66, the Plaintiffs represented that Skyforge is a holding company and its subsidiaries including BrightCore AG operate several platforms.

And then they go on to reference Los Pollos, Taco Loco company and previously Adtrafico. And so, we don't have an allegation of direct ownership here. If we did, then we are back to Your Honor's question about Excel and Microsoft; but we are not there on the pleadings that are currently before the Court.

**THE COURT:** Although I -- I mean, we have a representation -- at the very least addressing a concern I think that Counsel reasonably picked up on -- that somehow that the structure may enable -- prevent you from doing -- if we get to discovery from doing appropriate discovery and for the factual basis of the statements that were made by your clients.

We have that representation. So, in that sense -- I mean,

I have done it -- being here in Silicon Valley, I have done a lot of these. It turns out that actually a lot of the, you know, Google products or Meta products, if you actually get into the ownership structure, it is not necessarily Alphabet Incorporated or Meta Incorporated that owns them. There is a sub-LLC entirely owned and there is -- for various reasons I think they are structured this way. You still wouldn't say that a case against Google apps you can pursue against Alphabet Incorporated generally especially if we are talking about defamation claims --

**MR. GRYGIEL:** Right.

**THE COURT:** -- and the person who is attributed to. At least there is some sort of -- I'm not sure. I understand your point. I'm just not sure in the context especially of this kind of claim that the internal ownership structure is as significant where -- if the presentation to the world is that it is Sky/Tek and no one actually is thinking about these in terms of the subentities that may actually have the structure through which they happen to be operated.

**MR. GRYGIEL:** My understanding of the First Amendment case law again on this point, Your Honor, is it is distinct from a garden variety commercial dispute or contractual dispute where there may be byzantine corporate relationships; but here, because -- apparently these are complicated corporate relationships -- and, therefore, I think it is much more

difficult to indulge the notion as pleaded that statements about these platforms are about these two Plaintiffs.

**THE COURT:** Arguably, it goes the other way. I mean, because if -- who knows. I think it may be that Microsoft Excel is technically owned and operated by -- technically there is a subentity within Microsoft that is the ownership of the Office products -- Office 365.LLC or something like that -- but you would say generally you would still treat a criticism of Excel is about Microsoft.

I mean, I actually think in some ways the reason you treat these structures is for the other cases to say, you know, your contract is with Office 365 LLC as opposed to being with Microsoft Incorporated.

**MR. GRYGIEL:** I take the Court's point. Again, I think the First Amendment pleading requirements are a little different.

**THE COURT:** Okay. Thank you. I appreciate the parties' argument on the motion to dismiss. I know that obviously there is also the motion to strike and the motion to stay. I'm not going to issue any ruling at this point on the motion to stay. I will issue a ruling on that in connection with my motion ruling on the motions to dismiss and strike, which I will take under submission.

So, as it stands -- just to clarify things for the parties -- that, you know, we will proceed. I know there is a

dispute between the parties about whether they have already had their Rule 26(f) conference or not.

If -- hopefully they can work that out. I know that the updated date for that is not too far from now given that I think we have a late April CMC scheduled in this matter. So, it may be that the sort of issue of the status of the prior meeting becomes moot once you have that conference.

So, I'm not -- so, to be clear, I'm not staying discovery at this point. I understand there is a dispute about whether this is already open. That dispute may become moot once you have your scheduled Rule 26(f) conference in the near future. And so, if -- you could present that dispute to the magistrate judge -- the assigned magistrate judge. It is probably not -- perhaps not worth your time. I am not going to tell you what you can or cannot do. If there is a dispute about that issue, that's a discovery issue so it would go to the magistrate judge in the first instance.

Let me ask the parties -- I heard a lot. You know, the emotions are high. Is there any value to me seeing if there is a settlement -- a magistrate judge who would be available to meet with the parties in the settlement conference context, you know, soon; perhaps even while I'm still working on my decision on the motion to see if there is any space that could be -- any bridges that could be built across the divide?

**MR. GRYGIEL:** Your Honor, we are never opposed to that

type of initiative. I would want to confer with our client first before confirming our amenability; but generally as a proposition, certainly it's something that we would be interested -- I'm not saying we are not going to participate.

**THE COURT:** I understand. You have to communicate.

**MR. WIEBER:** So, as -- Your Honor, as it relates to that question, I have not asked that direct question of my clients but prior -- I think simply -- the answer would be my client has tried since at least November, December 2024 to get an audience of anything and those have all just -- so, the answer of whether somebody can help facilitate that -- while I don't have the direct, Your Honor, the authority -- I think I'm smart enough to understand where my clients' desires have always been, which was to not retain Winston & Strawn and to go through this process.

So, I think, yes, anything to get -- we have been willing to share information. That's why there is the presuit correspondence. We have been asked -- we wanted to get into a dialogue, and that has been universally rejected.

If there was a sea change in that, I think those could obviously coexist. And so, I think the answer would be, yes, my clients would -- I could go get confirmation but I don't think they would ever turn down -- I mean, litigation is expensive, and we have always been trying to get a way to get yes.

In fact, you even saw it in the papers, Your Honor, as we were having these disputes about are we in discovery, are we not in discovery, I had to my Greenberg colleagues, have said, like, can we take some of these things down so we can at least sort of stop this.

**THE COURT:** Yeah.

**MR. WIEBER:** So, we would entertain that.

**THE COURT:** So, what I will ask -- I understand you both needs to speak with your clients on this front. We do have some -- our magistrate judges are incredible in the settlement context. They are incredible in all respects but also in the settlement context. I do think there are times when just having a separate party including incredibly qualified magistrate judges to be -- to work with the parties can be useful. Maybe. Maybe not. There are no expectations and it is up to you.

If it is of mutual interest to both parties, what I just ask you to do is to file the form that's available on our website stipulating to a magistrate judge settlement conference.

And so, if I see that, I will approve it and I will reach out to my colleagues to figure out who has -- this would be considered an emergency conference just on the timeframe. It is better presumably sooner rather than later. I will reach out to them and see what I can do.

**MR. WIEBER:** Thank you for those thoughts, Your Honor.

**MR. GRYGIEL:** Thank you very much, Your Honor.

**THE COURT:** Thank you. Have a good afternoon.

**THE CLERK:** Court is concluded.

(Proceedings adjourned at 11:40 a.m.)

---oOo---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: April 7, 2026

Marla Knox

Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
United States District Court - Official Reporter